**UNIVERSAL ATHLETIC SALES COMPANY**

v.

**AMERICAN GYM, RECREATIONAL & ATHLETIC EQUIPMENT CORPORATION, INC., et al.**

**Civ. A. No. 71–166.**

United States District Court,
W. D. Pennsylvania.

June 23, 1975.

Amended Judgment Order
Oct. 29, 1975.

Robert D. Yeager, Pittsburgh, Pa., Lewis M. Dalgarn, Los Angeles, Cal., for plaintiff.

Thomas H. Murray, Hymen Diamond, Monroeville, Pa., Floyd P. Carothers, Lawrence Zurawsky, Pittsburgh, Pa., for defendants.

## OPINION

KNOX, District Judge.

In this civil action the court must determine the validity of United States Letters Patent No. 2,932,509, "Body Exercising Apparatus", issued to Harold Zinkin on April 12, 1960. This action is but a part of a larger litigation among these parties. Their lawsuits in this court involve questions of copyright infringement, unfair competition, patent infringement, patent misuse, and antitrust violations.[1] The path of this litigation has been filled with detours: a motion to disqualify counsel, a motion for civil contempt, and of course, lengthy discovery with resistance from both sides. Zinkin's "Body Exercising Apparatus" has given exercise to lawyers and judges in a manner the inventor would never have imagined.

■ Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the court severed for trial the issues of patent validity, patent infringement, and unfair competition by defendants, thereby saving for a later time, if necessary, the questions of patent misuse and antitrust violations by plaintiff. Separation of these issues for convenience, expedition and economy is within the court's discretion and has been widely approved. See "Separate Trials in Patent-Antitrust and Patent-Unenforceability Litigation", John B. Pegram, 64 F.R.D. 185 (1974). Because we have severed these issues, we reject at this time certain findings of fact proposed by the parties but limit our findings to matters actually litigated or to which both parties agree. The findings and conclusions of law appear in this opinion pursuant to Rule 52(a).

## I. PATENT VALIDITY AND INFRINGEMENT

The Zinkin patent contains eight claims of invention. Of these, only claims under Numbers 3 and 4 are disputed in this case. The claims read as follows:

"3. A body exercising apparatus comprising an elongated substantially horizontal table having a predetermined head end and a foot end, an elongated bar extended from the head end of the table in substantial alignment therewith and having an end adjacent to the table and an opposite end, means pivotally mounting the extended end of the bar for pivotal movement about a substantially horizontal axis transversely of the table and in spaced relation to the head end thereof whereby elevational movement of the bar causes the end thereof adjacent to the table to describe an arc with its concave side disposed toward the table, a pair of handles aligned transversely of the table, means rigidly mounting the handles on the bar for integral pivotal movement therewith, stop means engageable with the bar limiting downward travel of the handles to positions in upwardly spaced relation to the table, and means connected to the bar resistive to upward pivotal movement thereof.

"4. A body exercising apparatus comprising an elongated substantially horizontal table adapted to support a person in supine position thereon having a predetermined head end and foot end, a framework adjacent to the head

---

1. The copyright action has been adjudicated and is reported at 340 F.Supp. 899 (W.D. Pa.1972) rev'd. 511 F.2d 904 (3d Cir. 1975) in which the circuit held no infringement. Other opinions in this case appear at 53 F. R.D. 582 (1971) (Motion to amend answer and file counterclaim); 357 F.Supp. 905 (D.C.1973) (Refusal to disqualify counsel); and 376 F.Supp. 514 (D.C.1974) (Finding of civil contempt) rev'd. on other grounds 511 F.2d 904 (3d Cir. 1975).

end of the table, an elongated bar pivotally mounted in the framework in substantial alignment with the table for movement about a substantially horizontal axis transversely of the table in spaced relation to the head end thereof and said bar being extended toward the table, a pair of handles rigidly mounted on the bar and disposed on opposite sides of the head end of the table, said bar terminating short of the table and leaving the area above the head end thereof free from obstruction, adjustable weight means borne by the bar, and a stop mounted in the framework engageable with the bar limiting downward pivotal movement thereof to a position with the handles disposed at an elevation above the table."

In simple terms, the claims describe a machine for simulating the chest press exercise performed with a free barbell. If done with a barbell, the exerciser lies on his back on a table and raises the barbell, to which weights may be added, from a position where his hands are near his chest and the bar is approximately aligned with the nipples to a position where the arms are fully extended and the bar is aligned with the shoulders. The exerciser continues by raising and lowering the barbell as many times as he desires or is able. A "spotter." is generally required to handle the barbells before and after the exercise and to safeguard the exerciser should he tire.

Using the patented machine, the exerciser lies on his back on a table and pushes against handles. The handles are mounted horizontally and at right angles to the exerciser's body so that the exerciser's hands are approximately in the same position as they would be to perform a chest press with a barbell. When the exerciser pushes on the handles, they move through a shallow arc to a point approximately the same as that of the final position in the chest press with a free barbell. The design of the machine prevents the handles or attached bar and weights from striking the exerciser should he tire and be unable to complete the lift. The handles cannot move laterally with respect to the exerciser.

The machine does not consist of complicated arrangements of motors, gears, pulleys, springs, or other mechanical apparatus. Essentially, the machine is a lever. One end of the lever is pivotally mounted to a solid frame. The other end has handles attached. Weights are mounted to the lever to provide resistance, and provision is made so that the amount of resistance can readily be changed.[2]

There is no question raised in this case as to the utility of the patented device. The utility of the chest press machine is apparent by its commercial success, by its safety advantage over the free barbell (the weights cannot fall on the exerciser), by the elimination of a spotter, and by the fact that the exerciser need not balance the resistance against lateral movement.

The defendants attack the Zinkin patent as lacking in novelty and being, at best, an obvious improvement on prior art. In statutory terms, their objections are embodied in 35 U.S.C.A. §§ 102, 103.[3] After careful consideration, the

---

2. The Zinkin patent shows weights stacked on a pin above the lever. The machines actually manufactured and sold by both the plaintiff and the defendant have weights suspended below the lever. The amount of resistance is changed by simply moving the selector key, and the weight stack itself serves as the "stop means" to prevent the lever from striking the exerciser. The plaintiff admits that the use of a selector key is quite old and does not claim invention in its use, but characterizes its use as the "essential equivalent of the patent". Trans. p. 27.

3. § 102. *Conditions for patentability; novelty and loss of right to patent*
A person shall be entitled to a patent unless
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a

court concludes that the Zinkin patent is void for obviousness and lack of novelty and invention.

■■ We must begin with the proposition that a patent is presumed to be valid and that the burden of proof is on the party asserting invalidity. 35 U.S. C. § 282. As noted in Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F. 2d 66 (3d Cir. 1972), cert. den. 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262, the burden of proof is a heavy one and invalidity must be demonstrated by clear and convincing proof.

The Supreme Court has set forth the criteria for determining the question of obviousness in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966):

> "[T]he scope and content of the prior art . . ., differences between the prior art and the claims at issue . . .; and the level of ordinary skill in the pertinent art . . .. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." 383 U.S. at 17, 86 S.Ct. at 694, 15 L.Ed.2d at 556.

The Supreme Court recognized in John Deere that § 103 was, for the first time, a statutory expression of the additional requirement of patentability originally expressed in Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683 (1850).

While the court noted that § 103 abolished the controversial phrase "flash of creative genius" used in Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941), and that the section focuses on the term "non-obvious" rather than on the "invention" language of Hotchkiss, the court held:

> "Although we conclude here that the inquiry which the Patent Office and the courts must make as to patentability must be beamed with greater intensity on the requirements of § 103, it bears repeating that we find no change in the general strictness with which the overall test is to be applied." 383 U.S. at 19, 86 S.Ct. at 694, 15 L.Ed.2d at 557.

The overall test referred to is indeed a rigorous one, and no better expression of this can be found than in the famous "A & P" case [Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162 (1950)] in which the court held invalid a patent for the invention of "a cashier's counter equipped with a three-sided frame, or rack, with no top or bottom, which, when pushed or pulled, will move groceries deposited within it". The court said:

> "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained, when on the contrary, their

foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\*　　\*　　\*　　\*　　\*

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent.

§ 103. *Conditions for patentability; non-obvious subject matter*

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1953, c. 950, § 1, 66 Stat. 797–798.

effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly." 340 U.S. 152–153, 71 S.Ct. at 130, 95 L.Ed. at 167.

The court in John Deere also clearly delineated the requirements of patentability as follows:

"The Act sets out the conditions of patentability in three sections. An analysis of the structure of these sections indicates that patentability is dependent upon three explicit conditions: novelty and utility as articulated and defined in § 101 and § 102, and nonobviousness, the new statutory formulation, as set out in § 103."

Again, in Anderson's Black Rock v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), the court said:

"The patent standard is basically constitutional, Article I § 8, of the Constitution · authorizing Congress '[t]o promote the Progress of . . . useful Arts' by allowing inventors monopolies for limited times. We stated in Graham v. John Deere Co., 383 U.S. 1, 6, 86 S.Ct. 684, 15 L.Ed.2d 545, 550, that under that power Congress may not 'enlarge the patent monopoly without regard to the innovation, advancement or social benefit gained thereby. Moreover, Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available. Innovation, advancement, and things which add to the sum of useful knowledge are in-

herent requisites in a patent system which by constitutional command must "promote the Progress of . . . useful Arts". This is the *standard* expressed in the Constitution and it may not be ignored.'

\* \* \* \* \* \*

"We conclude that while the combination of old elements performed a useful function, it added nothing to the nature and quality of the radiant-heat burner already patented. We conclude further that to those skilled in the art the use of old elements in combination was not an invention by the obvious-nonobvious standard. Use of the radiant-heat burner in this important field marked a successful venture. But as noted, more than that is needed for invention."

██ In determining the question of obviousness the court must consider all prior art whether or not the patentee knew of it. Layne-New York Co., Inc. v. Allied Asphalt Co., Inc., 501 F.2d 405 (3d Cir. 1974) cert. den. 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975); Arrow Safety Device Co. v. Nassau Fastening Co., 496 F.2d 644 (3d Cir. 1974). The fact that significant prior art not considered by the Patent Office is brought forth weakens the patent's presumption of validity. Layne-New York, supra; U.S. Expansion Bolt Co. v. Jordan Industries, Inc., 488 F.2d 566 (3d Cir. 1973).

█ We are cautioned that the mere simplicity of the device, though it may suggest obviousness, is not by itself a reliable test of obviousness, as many things will seem obvious when viewed with the advantage of hindsight. See Price v. Lake Sales Supply R. M., Inc., 510 F.2d 388 at 393 (10th Cir. 1974). A device may of course, satisfy the requirement of Section 102 with a novel combination of old elements, yet fail to satisfy the Section 103 requirement of non-obviousness.

It is against this background that the court must determine the validity of Zinkin's patent. The defendants rely on

the following in support of their claim of invalidity:

DX–3 (in part)

Patent No. 117,339, dated July 25, 1871, by C. A. Simmons for a "Lifting Machine". (Cited by Patent Office as prior art).

DX–7 and DX–17

Picture appearing in "Strength and Health" magazine, May-June, 1950, p. 50, showing exercise apparatus attributed to Sam Loprinzi and described in the accompanying text as "super-duper pressing apparatus". DX–17 is an artist's sketch of the apparatus shown in DX–7 (Not cited by Patent Office as prior art).

DX–15

Marcy's "New Mach 1" exercising machine, shown in Marcy catalogue of 1975.

DXE–35

Machine used by Pittsburgh Steeler Football team. Designed by Reicke.

We now discuss these materials under the primary criteria set forth in Graham. In our inquiry here we will disregard the Marcy and Reicke machines (DX–15 and DXE–35), as these were obviously designed subsequent to the Zinkin patent.

### (A) The Scope and Content of the Prior Art.

The Simmons patent shows an exercising machine patented in 1871. A framework consisting of three sets of parallel bars is pivoted on a stand. Each set of parallel bars has notches in which a cylindrical weight is placed, and the amount of resistance to be lifted is adjusted by placement of the weights in the various notches. The framework has handles with which the exerciser pivots the bar and weights. As the patent does not picture a table and since the specifications state: "I make two sets of handles at different heights for suiting the machine to short or tall people,"

it is apparent that the machine is used to perform lifts from a standing, rather than a prone, position.

The Loprinzi apparatus (DX–7 and 17) shows a pair of levers over a table. The levers have brackets for weights. From looking at the picture, it is not clear in what direction the levers can be moved, but the caption "super-duper pressing apparatus" would clearly indicate to one familiar with weight-training that the movement is vertical. It also appears that each lever is moved independently of the other, but that, too, is not certain from the picture and caption. A picture of the Loprinzi apparatus appeared in a magazine of May-June, 1950.

### (B) Differences Between the Prior Art and the Claims at Issue.

The Zinkin, Simmons and Loprinzi devices all operate on the same basic principle: weights attached to a lever are rotated about a pivot. The Simmons patent is designed, not for the chest press exercise, but for some other exercise performed in a standing position. However, we find this difference insignificant and find that it would be obvious to change the design to a higher or lower elevation so that the exerciser can perform different lifts. The addition of a table for this purpose is a trivial change. Likewise, we find that the handles on which the exerciser pushes or pulls are different on the three devices, but that this change, too, is obvious. The three devices, of course, are quite different in appearance, but as we have stated, their operating principles are essentially the same. We find that the improvements made by Zinkin over prior art and cited by plaintiff as invention are no more significant than the change in the method of providing resistance between the commercially sold machines and the actual patent. This latter difference the plaintiffs consider insignificant and merely the "essential equivalent of the patent."[4]

4. See Footnote 2.

■■■■■■■■■■■

(C) *The Level of Ordinary Skill In the Pertinent Art.*

The record on this point is somewhat deficient. The parties have addressed this question in terms of the knowledge and skill of persons in the weight-training industry, viz: persons who are quite familiar with exercises, muscular development, and weight-training equipment but who have not been shown to have any particular skills in mechanical engineering. The record does however, contain opinions by both parties' experts as to obviousness. The court chooses to adopt the view of defendant's expert Firman Lyle. We hold that in light of the ancient origin of the lever and the prior application of the lever in the Simmons and Loprinzi machines, the development of the Zinkin machine was well within the ordinary skill of one knowledgeable in the pertinent arts.

Of course, there is no suggestion in the above remarks that an improvement must be obvious merely because it was made by one without particular skills in the pertinent art or craft. But we do hold that this simplistic device in a crowded art is obvious and not patentable. Examination of the Zinkin machine leaves the court with the unshakable belief that any competent mechanical engineer, assigned to design a device for performing a chest press and informed of the prior art, could readily create a machine substantially the same as that of plaintiff's.

Our opinion does not change when we consider the patent as a whole, rather than as a combination of several small changes. The plaintiff has created a useful machine, but one with no surprises, the sum of whose parts are no greater than its individual components. The Zinkin machine is one about which the Supreme Court might say, as it did in A & P, "Two and two have been added together, and still they make only four." 340 U.S. at 152, 71 S.Ct. at 130, 95 L. Ed. at 167.

The plaintiff has produced considerable expert testimony that the arcuate movement of the handles on the Zinkin machine is a better method of exercising than the straight-line up and down movement found in other chest press apparatus and in the free barbell chest press. The defendants have produced contrary expert opinion.

The plaintiff admits that Zinkin did not have that factor in mind when he designed the machine, but they cite it as an unexpected benefit still deserving of patent protection. We find the evidence of this supposed benefit unconvincing. While several witnesses indicated they felt the arcuate movement more natural and comfortable, others testified to the contrary. We find that either exercise is equally beneficial. The preferences stated for one over the other have no more significance than the fact that some people like one lump of sugar in their coffee but others must have two. The amount of curvature through which the handles actually move in plaintiff's commercially sold machine is very small, and we find that the arcuate movement has no real significance. We are unable to find that such movement has any superiority in building muscles.

■■■ The court concludes that the Zinkin Patent is void as obvious within the meaning of 35 U.S.C. § 103. For similar reasons, we also hold that the Zinkin patent is void for lack of novelty within the meaning of 35 U.S.C. § 102, as it was anticipated by prior art. We are, of course, aware of the cases that state that anticipation means that every element of the claims is found in a single prior art reference, but we find that both the Simmons and Loprinzi devices satisfy this criterion. The differences in the Zinkin Patent from these prior art references, such as the addition of a table and a different method of providing "stop means", are minor and do not make the doctrine of anticipation inapplicable.

In addition, we find that the defendant's chest press apparatus would infringe the Zinkin Patent if the Zinkin Patent were not void as obvious and

lacking in novelty. While the question of infringement is, of course, rendered moot by our determination of patent invalidity, we make that finding at this time in the interest of judicial economy for whatever value it may have in the future of this ongoing litigation. We do not, however, by making this finding foreclose the question of patent misuse.

## II. UNFAIR COMPETITION

The plaintiff asserts that the defendants have made various misrepresentations and have engaged in other unfair competitive practices in selling their "Super Gym", thereby making them liable to plaintiffs under the common law and under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The alleged unfair competitive practices include false and misleading specifications in advertising brochures, false assertions that "Super Gym" and other trade names of the defendants are registered trademarks, the use of side-by-side comparison charts which allegedly misrepresent both plaintiff's and defendants' products, the use of "specious" guarantees that defendants could not financially undertake, misrepresentations about defendants' sales and financial condition, and the displaying of one of plaintiff's machines in a "dirty, corroded, broken and incomplete" condition.

The Lanham Act, 15 U.S.C. § 1125(a) [5] provides a civil remedy by way of damages or injunction against anyone who, in connection with goods or services in commerce, uses a false description of origin or any false description or representation. Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648 (3d Cir. 1958); L'Aiglon Apparel v. Lana Lobell, Inc., 214 F.2d 649 (3d Cir. 1954). Both of these cases recognize the Lanham Act as creating a new federal tort and indicate that as the Act is a remedial statute, it should be broadly construed. While it is well established that the Act does not prohibit every kind of unfair competitive practice, such as misrepresentations about a competitor's product, Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279 (7th Cir. 1969) cert. den. 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92, some cases have indicated that the Act prohibits any misrepresentation about one's own products and is not limited to misrepresentations involving trademarks, designations of the origin of goods, and other attempts to "pass off" one's goods as those of another. Ames Publishing Co. v. Walker-Davis Publications, Inc., 372 F.Supp. 1 (E.D.Pa.1974).

Other circuits have indicated a more limited scope for the Lanham Act than has the Third Circuit. In Bernard Food, supra, the court says, quoting from Samson Crane Co. v. Union National Sales, Inc., 87 F.Supp. 218 (D. Mass.1949) aff'd per curiam 180 F.2d 896 (1st Cir. 1950):

"It is true that the section speaks of 'any false description or representation' but this must first be interpreted in the light of the succeeding phrase which explains these words as including words or symbols tending falsely to describe or represent, not any fact, but the goods or services in connection with which the description or representation is used. The intent of Congress in passing the Act is set forth in the final paragraph of Section 1127. Only one phrase of that paragraph fails to use the word 'mark'. And that phrase ('to protect persons engaged in such commerce against unfair competition') must in

5. "(a) Any person who shall affix, apply, or annex, *or use in connection with any goods or services*, or any container or containers for goods, a false designation of origin, or any *false description or representation, including words or other symbols tending falsely to describe or represent the same,* and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that *he is or is likely to be damaged by the use of any such false description or representation.*"

such a context be construed to refer not to any competitive practice which in the broad meaning of the words might be called unfair, but to that 'unfair competition' which has been closely associated with the misuse of trade-marks, i. e., the passing off of one's own goods as those of a competitor. It is clear, both from this statement of the intent and from a reading of the Act as a whole, that the primary purpose of the Act was to eliminate deceitful practices in interstate commerce involving the misuse of trademarks, but along with this it sought to eliminate other forms of misrepresentations which are of the same general character even though they do not involve any use of what can technically be called a trade-mark. The language of Section 43(a) is broad enough to include practices of this latter class. But the section should be construed to include only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other *improper use of trademarks*. It should not be interpreted so as to bring within its scope any kind of undesirable business practice which involves deception, when such practices are outside the field of the trade-marks laws, and especially when such undesirable practices are already the subject of other Congressional legislation, such as the Federal Trade Commission Act. (Footnote omitted.)"

The Third Circuit case of Parkway Baking, supra, involved the mis-use of the designation "Hollywood Bread" on defendant's products thereby implying that it was sold under the sponsorship or with the approval of the registered owner of the "Hollywood" trademark. L'Aiglon Apparel, supra, concerned the fraudulent and injuries use of a picture of plaintiff's $17.95 dress in advertising defendant's $6.95 dress. Both of these cases involved the "passing off" of goods within the ambit of Bernard Food, supra, and do not actually involve misrepresentations of the kind found here. The court has some reservations as to whether the Third Circuit would today hold that the misrepresentations of this kind are actionable by a competitor under the Lanham Act. However, because of the broad language in L'Aiglon and Parkway Baking, and in light of the recent Eastern District of Pennsylvania case of Ames Publishing Company, supra, the court feels constrained to hold that the Lanham Act applies to misrepresentations of one's own goods, even where the misrepresentations do not tend to confuse one's goods with those of a competitor or otherwise misstate the origin of the goods or to pass the goods off under another's trademark.

The court has weighed the testimony of Larry Salkeld very carefully. During his early testimony, while he was President of Super Athletics Corporation, he was an uncooperative witness and even walked out of one deposition before it was completed. After he was fired by defendants, he became hostile toward them, and as we stated in Universal Athletic Sales Co. v. American Gym, et al., 357 F.Supp. 905 (D.C.1973), he had to some extent "sought shelter in the tents of the enemy".

In the light of this, the heavy reliance placed upon Salkeld's testimony by the plaintiff may be misplaced, but in view of the many exhibits and the corroborating testimony of the other witnesses, we find that Salkeld's testimony is substantially true and that the practices complained of by plaintiff generally occurred.

The machines actually produced by the defendants generally failed to conform to the specifications in the advertising brochures. It further appears, however, that defendants' orders were taken to some extent on a custom made basis, that is, the machines were made to meet the particular requests of individual purchasers. Further, many of the changes between the machines actually delivered and those advertised resulted from good faith attempts to improve the

product, or because the specifications originally listed proved unworkable.

Most of plaintiff's claims are nonactionable under common law and under the Lanham Act. For example, failing to register a trade name can make it unenforceable, but plaintiff has shown the court no case law or statute that provides a competitor redress in damages for false representations that the trade name is registered. In any event, the court does not see how such a misrepresentation injures a purchaser of the machine, or a competitor, where the competitor does not claim the trade name as its own.

Other alleged misrepresentations are not misrepresentations of present facts at all but are future promises. For example, defendant's guarantee, no matter how "specious", is simply a promise that should the product fail, Super Athletics would repair or replace it, according to the terms of the guarantee. Failure to honor the guarantee would give a cause of action to a purchaser, but not to a competitor not privy to the sale. In addition, there is no evidence that the defendants failed to honor their guarantees; in fact, the evidence shows the contrary.

Disparagement of a competitor's product is also not actionable under the Lanham Act. Bernard Food, supra. Nor does the record contain sufficient evidence of common law disparagement of plaintiff's products to warrant relief on that basis. Every competitor in the market place is expected to sing a little of the tune "Anything Theirs Can Do, Ours Can Do Better". See Ringling Brothers v. Chandras Am. Line, Inc., 321 F.Supp. 707 (S.D.N.Y. 1971).

The brochures and comparison charts used by defendants, however, contain a number of overstated or misleading descriptions of their product. While slight discrepancies would almost inevitably occur, we find that the consistent overstatement of the amount of resistance during the various exercises, and the general failure to give true resistance after adjusting for leverage effects, are material misrepresentations of a kind actionable under the Lanham Act in accordance with our previous discussion.

We further find that reliance by purchasers and damage to plaintiffs, who bid against defendants on numerous sales, have also been shown. We find this on the basis of Farrell's testimony as to the trade practices in the industry, Salkeld's testimony, and PTX–56, a letter of complaint that a machine received "hardly bears a resemblance to the ones shown me on my visits to the factory—[n]or does it meet the specs. in the brochure."

Regardless of whether Salkeld's actions as President of Super Athletics Corporation would make him and the corporation liable for unfair competition, we find no basis for imposing personal liability on defendants Brodsky and Pinchock. While these two were stockholders and officers of Super Athletics Corporation, it appears that Salkeld alone had the personal knowledge of the specifications on the brochures and comparison charts. While these defendants did on some occasions review the comparison charts and brochures with Salkeld to verify their accuracy, they relied considerably on his knowledge and expertise. We find that neither of these defendants personally mailed, or directed others to mail, advertising material with specifications they personally knew or should have known to be false.

We therefore will enter judgment for the plaintiff against the defendant Super Athletics Corporation and in favor of the defendants Pinchock and Brodsky against the plaintiff, on the Lanham Act claim. The appropriate damages to be recovered by plaintiff will be determined at a time to be hereafter fixed.

In view of our findings under the Lanham Act, we find it unnecessary at this time to determine whether common law unfair competition has been shown under the Restatement of Torts, Section

761, or otherwise. In view of the multi-state sales occurring in this case, we decline to determine that issue in view of the limited briefing by the parties at this time.

No judgment against Salkeld is entered at this time because default judgment was previously entered against him on April 22, 1974.

### JUDGMENT ORDER

And now, to wit, June 23, 1975, for reasons set forth in the foregoing opinion,

It is ordered that Patent No. 2,932,509 issued to Harold Zinkin on April 12, 1960 is hereby adjudged and declared to be invalid.

It is further ordered that with respect to the issues of patent validity and infringement, judgment be and hereby is entered in favor of defendants and against plaintiffs.

It is further ordered with respect to the plaintiff's claims of unfair competition, judgment be and hereby is entered in favor of plaintiff and against the defendant Super Athletics Corporation only and in favor of defendants Pinchock and Brodsky.

It is further ordered that there is no just reason for delay and the Clerk of Court is expressly directed to enter a judgment in accordance with this order and Rule 54(b) of the Federal Rules of Civil Procedure.

The court certifies in accordance with 28 U.S.C. § 1292(b) that there is substantial ground for difference of opinion with respect to these matters and that an immediate appeal from this order may materially advance the ultimate termination of the litigation.

It is further ordered that the amount of damages to be assessed against Super Athletics Corporation be reserved for future determination by the court. In view of the present bankruptcy of Super Athletics Corporation, it may be that the assessment of such damages is of little value to the plaintiff but it may be of value with respect to possible set-offs against counterclaims filed by defendants against the plaintiff and for this reason the adjudication of such amounts is reserved for further determination.

It is further ordered in view of the fact that defendant's counterclaims against the plaintiff have been severed that any appeal taken hereunder shall not stay proceedings as to the said claims of the defendant against the plaintiff.

### AMENDED JUDGMENT ORDER

And now, to wit, October 29, 1975, the judgment order entered June 23, 1975, is hereby amended as follows:

It is ordered that Claim Nos. 3 and 4 of Patent No. 2,932,509 issued to Harold Zinkin on April 12, 1960, are hereby adjudged and declared to be invalid;

It is further ordered that as to the remaining claims of that patent the judgment entered June 23, 1975, is vacated, no determination being made as to the validity of those claims;

It is further ordered that plaintiff's motion to alter and amend judgment is otherwise denied and the judgment entered in this case on June 23, 1975, is re-affirmed except as expressly amended and altered in this order.