**JOHN WRIGHT, INC., a Pennsylvania Corporation, Plaintiff,**

v.

**CASPER CORPORATION, a New York Corporation and Casper Pinsker, Individually and doing business as Casper Imports, Defendants.**

Civ. A. No. 75–63.

United States District Court,
E. D. Pennsylvania.

June 25, 1976.

Manny D. Pokotilow, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for plaintiff.

Frederick L. Fuges, MacCoy, Evans & Lewis, Philadelphia, Pa., Marie V. Driscoll, Rogers, Hoge & Hills, New York City, for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

The parties to this lawsuit are rivals in the manufacture and sale of mechanical penny banks. Each claims that its products are faithful reproductions of original cast-iron banks—now collectors' items—which were introduced in the United States shortly after the Civil War and remained popular through the early 1900s. John Wright, Inc. is the senior of the two competitors; it seeks injunctive relief and damages for alleged unfair competition and false advertising. At the close of the hearing on plaintiff's Motion for Preliminary Injunction I reserved decision and gave the parties the option to bypass further preliminaries by submitting whatever additional evidence they deemed necessary to complete the record and convert the proceedings to a final hearing on the matter. They chose this course and filed supplemental materials, including exhibits and depositions, for my review. What follows, therefore, is my final decision; plaintiff's Motion for Preliminary Relief will be denied as moot.

## I. FINDINGS OF FACT

1. The plaintiff is a corporation and a citizen of Pennsylvania having its principal place of business at 113 N. Front Street, Wrightsville, Pennsylvania 17368.

2. The defendant Casper Corporation (Casper) is a citizen of New York. Its principal place of business is located at 14 E. 28th Street, New York, New York 10016.

3. Casper does business in the Eastern District of Pennsylvania and elsewhere.

4. The defendant Casper Pinsker is a citizen of Connecticut residing at 18 River Lane, Westport, Connecticut 06880.

5. Casper Pinsker does business as Casper Imports, a corporation which is a citizen of New York, with headquarters at 14 E. 28th Street, New York, New York 10016.

6. Casper Imports does not manufacture, import, advertise, sell, or have anything at all to do with mechanical penny banks.

7. The first patent on a cast-iron mechanical penny bank was issued in 1869. This bank was a modest action toy which used a balance mechanism: The weight of the penny, placed on a strategic spot, caused a small figurine to tip forward into a hatch in the top of the bank, carrying the penny with it. A door then closed over the hatch.

8. Other, more elaborate penny banks followed, using intricate level, spring, and clockwork devices designed to maximize their "action" features. Between 1870 and 1910 approximately 250 different banks were produced, most of which were patented. Some were humorous, by 19th century standards; many celebrated Americana and patriotic or military themes (e. g., Uncle Sam, Teddy Roosevelt and the Bear, Artillery Bank). There was a Tammany Bank featuring Boss Tweed. Penny banks commemorated the Centennial of 1876 and the World's Fair of 1892. Many fanciful penny banks were designed to appeal especially to children (Humpty Dumpty, Punch and Judy, Circus Clown, Trick Pony, and others).

9. All patents on these original penny banks expired long ago.

10. In the 19th century, mechanical penny banks were made either from a disassembled, cast-iron model or, in the case of a wholly-original design, from individual wooden parts. Brass masters, or match plates, were made of each piece. From the match plates the artisans fashioned sand molds into which they poured molten iron. Finally, the cooled, cast-iron pieces were filed, assembled, and painted, all by hand. In the course of each casting process, the sand molds were destroyed, but the brass match plates, from which new sand molds continually were made, lasted for many years.

11. The leading manufacturer of 19th century mechanical penny banks was the J. & E. Stevens Company of Cromwell, Connecticut (Old Stevens Foundry).

12. Another foundry which produced penny banks during this time was the Grey Iron Casting Company of Mt. Joy, Pennsylvania.

13. In 1957 an advertising man named Lee Howard approached The Grolier Society, Inc. (Grolier), a publishing firm in New York, with an idea for a public relations campaign on behalf of Grolier's children's encyclopedia, The Book of Knowledge. Howard proposed to assemble a collection of original mechanical penny banks, under the aegis of The Book of Knowledge; to arrange for production of authentic replicas of these banks; and to persuade lending institutions throughout the country to sponsor and publicize local exhibits of The Book of Knowledge penny bank collection and to offer a limited number of the replicas for sale to the general public.

14. Grolier accepted Howard's proposal. On February 1, 1957, they signed an agreement which provided, among other things, that Grolier would finance the purchase, through Howard, of a number of original antique penny banks; that Howard would supervise and bear the cost of manufacturing replicas of these originals; that on the base of each replica would be an inscription to the effect that, "This coin bank is a reproduction of the original in the collection of The Book of Knowledge"; that Howard would develop public relations materials for use by participating lending institutions; that these materials would stress the fact that the reproductions were of originals in The Book of Knowledge Collection; and that each replica sold to the public would be accompanied by a certificate of authenticity and a leaflet or brochure describing the history of 19th century penny banks and "carrying a short description of the background of The Book of Knowledge."

15. Paragraph 9 of the agreement authorized Howard to use the names "The Grolier Society" and "The Book of Knowledge" in his penny bank advertising materials and gave Grolier the right to review all copy in advance of its publication. It provided further that if Grolier failed to "disapprove any copy in writing within ten (10) days after receipt by it of such copy, then such copy [would] be deemed approved."

16. The agreement was for three years, with an option to renew.

17. Pursuant to the agreement between himself and Grolier, Howard negotiated the purchase of a total of 31 original 19th century penny banks which came to be known as The Book of Knowledge Collection. All of the original banks in the collection were owned by Grolier, except for a small number which Howard bought with his own money and lent to the collection as permitted by the agreement.

18. Between 1957 and 1959, several hundred lending institutions throughout the country participated in Howard's Book of Knowledge campaign, which he called "The Tradition of American Thrift." Each participating bank received a shipment of eight

or nine original banks from The Book of Knowledge Collection which was displayed in its lobby amid wide publicity in all local news media. Participating banks purchased Book of Knowledge reproductions directly from Howard for $10 each and sold them to the general public at cost.

19. To manufacture reproductions of penny banks from The Book of Knowledge Collection, Howard selected the Grey Iron Casting Company of Mt. Joy, Pennsylvania (Grey Iron), because that foundry had made penny banks in the 19th century and had not mechanized its plant since that time. Thus, Grey Iron offered a manufacturing process which in all material respects duplicated that used by foundries in the 19th century to make original penny banks. There was only one substantial difference, designed to enhance the quality of the replica: Grey Iron used aluminum, rather than brass, for the match plates.

20. Grey Iron's match plates were made from original, disassembled banks from The Book of Knowledge Collection. Howard, as Grolier's agent, hand-delivered the original banks to Grey Iron and witnessed the manufacturing process, the first time around, from beginning to end.

21. With respect to the first few Book of Knowledge reproductions made at the Grey Iron foundry, Howard personally delivered a prototype of each replica, together with its original counterpart, to Grolier for a detailed comparison and approval before Grey Iron went into production on any models. Later, Grolier delegated this function to Howard and accepted his assurances on the quality and comparability of the Grey Iron replicas. There is no evidence to suggest that Grolier was anything but fully satisfied with the quality and authenticity of the Grey Iron reproductions from The Book of Knowledge Collection.

22. Pursuant to his contract with Grolier, Howard designed a "certificate of authenticity" signed by the then Editor-in-Chief of The Book of Knowledge, Ellen V. McLoughlin. It is reproduced below:

# Certificate of Authenticity

This mechanical coin bank is an authentic reproduction of the original antique in the collection of The Book of Knowledge. The very same processes and technique which created the original have been employed in the making of this fine reproduction. Molds were painstakingly made from the original bank, hand-cast in sand, and this reproduction then hand-assembled and hand-decorated.

Therefore, it is much more than merely a coin bank — more than a toy. It is a replica of a product of American ingenuity and craftsmanship. It is, indeed, a collector's item with historical interest and value.

Treasure it!

*Ellen V. Mc Loughlin*

Editor-in-Chief

**THE BOOK OF KNOWLEDGE**

Copies of the certificate of authenticity were displayed in the lobbies of lending institutions which hosted The Book of Knowledge collection between 1957 and 1959. Each Grey Iron reproduction sold by participating banks was accompanied by a certificate of authenticity and by a brochure designed by Howard (and copyrighted by The Book of Knowledge in 1957), "Some Facts About Antique American Mechanical Coin Banks." The 1957 brochure referred to the certificate of authenticity, but did not feature it prominently.

24. The certificate of authenticity has never been copyrighted.

25. In an exchange of letters dated June 23, 1959 and November 23, 1959, Howard and Grolier entered into an agreement which superseded their contract of February 1, 1957. The new agreement provided, among other things, that the "Tradition of American Thrift" campaign would be phased out as currently-participating lending institutions dropped out at the expiration of their contract with Howard and that the emphasis would then shift to retail merchandising of the Grey Iron reproductions through department stores and gift shops. The key feature of the 1959 agreement was that Howard would continue to advertise the Grey Iron banks as reproductions from originals in The Book of Knowledge collection and to emphasize, as before, the certificate of authenticity and penny bank leaflet. He was, in other words, to "work on essentially the same basis" as the 1957–59 campaign, except that he would operate through normal retail channels rather than through lending institutions. The 1959 agreement also lifted the $10 ceiling price on Grey Iron reproductions, and provided that Grolier would cease to pay an annual fee to Howard after February 1960. The agreement was to continue for a period of 10 years beginning on March 1, 1960.

26. Howard revised his penny bank brochure in 1960 and his advertising agency copyrighted it. Prominently featured on its opening page was a facsimile of The Book of Knowledge certificate of authenticity.

27. In 1960, Howard ended his connection with The Book of Knowledge and assigned his rights under the 1959 agreement with Grolier to Grey Iron. Grey Iron purchased Howard's entire interest in the project, including ownership of the master match plates and all other paraphernalia connected with the banks except for the originals themselves, which belonged to Grolier. Grey Iron assumed all responsibility for advertising and merchandising The Book of Knowledge reproductions. By letter dated December 12, 1961, Howard informed Grolier of this development.

28. By this time, Ellen V. McLoughlin had ceased to be Editor-in-Chief of The Book of Knowledge. Nevertheless, Grey Iron continued to use the original format for the certificate of authenticity and to credit The Book of Knowledge collection as the source of its reproductions.

29. At this juncture the original antique banks in The Book of Knowledge collection were returned to Grolier, except for the few which Howard had purchased on his own account and lent to the collection. Some of the banks in The Book of Knowledge collection are still in Grolier's custody. Others are in the Perelman Toy Museum in Philadelphia, Pennsylvania. The Book of Knowledge collection, as a single entity, no longer exists.

30. There was never a direct contractual relationship between Grolier and Grey Iron. Any right which Grey Iron had to reproduce The Book of Knowledge banks and to merchandise replicas under The Book of Knowledge name was derived from Howard's rights under his 1959 agreement with Grolier. After 1970, when the 1959 agreement between Howard and Grolier expired, Grey Iron's successor-in-interest, John Wright, acting with the tacit consent of Grolier, carried on the use of the name "The Book of Knowledge," and other facets of

the merchandising campaign formulated in 1957.

31. Between 1961 and 1967, Grey Iron manufactured penny banks reproduced from The Book of Knowledge collection, using the same aluminum match plates which it had made in 1957 from the original banks. Grey Iron published color brochures advertising its Book of Knowledge reproductions (under the name, "Greycraft") and also sold the banks through department stores, gift shops, and third-party retail catalogues. The certificate of authenticity, The Book of Knowledge brochure, and the base inscription crediting The Book of Knowledge as the source of the replicas were constant, prominent features of Grey Iron's penny bank merchandising.

32. John Wright, Inc. purchased Grey Iron and formally took over its foundry operations in 1967, retaining Grey Iron personnel and manufacturing procedures. Grey Iron, under that name, was designated as John Wright's manufacturing arm for Book of Knowledge reproductions; John Wright became the sales arm, in charge of advertising and marketing.

33. John Wright made and continues to make, through another foundry, gift and specialty items besides penny banks. It has made no effort to modernize the Grey Iron foundry and, on the contrary, has consistently stressed Grey Iron's traditional, hand-crafted manufacturing process as a major selling point for its Book of Knowledge penny bank reproductions. As Grey Iron's successor-in-interest, John Wright continues to credit The Book of Knowledge and to distribute a certificate of authenticity with each reproduction sold. John Wright sells 32 mechanical penny banks of which 31 are advertised as reproductions from originals in The Book of Knowledge collection. Since 1973, John Wright general catalogues also have featured a miniature facsimile of the certificate of authenticity signed by Ellen V. McLoughlin. Previous John Wright catalogues made no reference to the certificate of authenticity, although the certificate was featured in other promotional materials and retailers used it in point-of-sale displays.

34. John Wright holds no patent or copyright on its Book of Knowledge match plates, on the certificate of authenticity, or on any other facet of its manufacturing or merchandising operations with respect to penny banks reproduced from The Book of Knowledge collection. In recent years John Wright has added new penny bank models to its line and is seeking patents for some or all of them, but these are not related to The Book of Knowledge or the present lawsuit.

35. Sales of mechanical penny banks reproduced from The Book of Knowledge collection account for between 10 and 15 percent of John Wright's total business.

36. The annual sales volume generated by John Wright's Book of Knowledge reproductions is between $200,000 and $300,000.

37. John Wright's total annual advertising budget is approximately $70,000. The bulk of this is devoted to catalogues, brochures, trade journal advertising, and other materials in which the Book of Knowledge reproductions are featured, as well as other John Wright products.

38. John Wright displays its Book of Knowledge reproductions at specialty trade shows several times a year at an annual cost of between $20,000 and $25,000.

39. Until 1973 John Wright had only one competitor in the manufacture of a line of penny bank reproductions. This was Mechanical Replicas, Inc. of Boonville, New York. Mechanical Replicas was owned by James D. Capron, whose personal collection of original 19th century penny banks was the source of master molds for Mechanical Replicas' products. Sometime after January 1971, Capron sold his collection and master molds to Art Concepts, Inc. of Great

Neck, New York. The Capron collection was much smaller than The Book of Knowledge collection (10 to 12 banks) and not nearly as well-known to the general public. Neither Capron, Mechanical Replicas, nor Art Concepts ever used a "certificate of authenticity" in connection with the sale of Capron collection reproductions.

40. Between 1957 and 1973 several other companies sold penny banks but none advertised a line of reproductions from a particular collection of originals. Most offered only two or three different banks; some of these products were made of plastic, others of cast-iron. None of these minor competitors used a "certificate of authenticity" for their penny banks.

41. A "certificate of authenticity" is a common merchandising technique used in the sale of reproductions of coins, antiques, and objets d'art. With respect to reproductions of mechanical penny banks, however, only the plaintiff and its predecessors-in-interest used a certificate of authenticity prior to 1973. They pioneered this merchandising technique in their field and enjoyed the exclusive and well-publicized use of it for 16 years.

42. During this time, before the defendants' entry into the field, the mechanical penny banks sold by John Wright became associated in the minds of retailers and the general public, especially collectors of penny banks, with the original banks in The Book of Knowledge collection. An essential link in that association, and itself associated with John Wright's banks, was the certificate of authenticity from The Book of Knowledge, which accompanied every reproduction sold first by Howard, then by Grey Iron and John Wright, and which received extensive publicity over the years.

43. In 1957 Howard commissioned "scratchboard" drawings of various Book of Knowledge banks, which were used from time to time to illustrate and advertise the original collection and reproductions. There is no evidence that these drawings

ever acquired a secondary meaning linking them in the public's mind with the products of Grey Iron or John Wright; the drawings were not copyrighted by either company.

44. In the early 1970s John Wright, Inc. was taken over by Donsco, Inc., a holding company. Under Donsco, Grey Iron and John Wright carried on their respective functions of manufacturing and merchandising reproductions from The Book of Knowledge match plates. No material change in manufacturing process was made; the match plates produced in 1957 are still being used.

45. The defendant Casper Pinsker began to assemble his personal collection of original 19th century mechanical penny banks in the late 1950s and early 1960s. As of June 1975 there were between 75 and 85 original banks in that collection.

46. In 1972 Casper Pinsker and three other people formed Casper Corporation (Casper) for the purpose of manufacturing and marketing penny bank reproductions. They first tried to mass-produce replicas through a manufacturing agent in Japan, using John Wright banks as master models. This attempt was unsuccessful.

47. Casper then acquired a manufacturing agent in Taiwan. Casper Pinsker personally delivered a number of antique penny banks from his personal collection to this Taiwan representative, plus some matching John Wright banks. Pinsker gave his Taiwan agent verbal instructions to use the John Wright banks as it pleased (e. g., take them apart to study their mechanism), but to use Pinsker's own antique banks to make master molds from which the reproductions would be cast. Neither Casper Pinsker nor any other American representative of Casper Corporation ever watched a master mold being made at the Taiwan factory or made a detailed side-by-side comparison between the reproductions and the original banks in the Pinsker collection. Casper Pinsker from time to time visited Taiwan

and witnessed different stages of the production process for some but not all of the banks reproduced there. He never was present from beginning to end of a single manufacturing process and is unable positively to state, on personal knowledge, that any Casper reproduction was in fact cast from a master mold made from an original bank in the Pinsker collection rather than from a mold made from a John Wright bank.

48. The Trick Pony bank sold by Casper contains. a circular impression on its base which is not found on the original bank but is used by John Wright as an identification device on its Trick Pony bank, which was reproduced from an original Trick Pony in the Book of Knowledge collection. It thus seems clear that the Trick Pony sold by Casper is a replica not of an original Pinsker collection bank, but of a John Wright Book of Knowledge reproduction.

49. There is no evidence that any other Casper bank was cast from a mold made from a John Wright bank. Several of Casper Pinsker's original banks were returned to him from Taiwan in a condition which strongly suggests that they were in fact used to make master molds.

50. Casper Pinsker has never directly asked his Taiwan agent if John Wright banks, rather than original banks, have been used to fashion master molds for Casper reproductions.

51. Casper claims that its Taiwan-made banks are sand-cast and hand-crafted in the authentic 19th century tradition, but it is unable to describe the manufacturing process in detail. Casper owns the master molds but leaves its Taiwan agent with full responsibility for the manufacturing process and the quality of the product.

52. Casper penny banks first appeared in the gift trade at the Atlantic City Glass & China Show in January 1973, but not under Casper's name. Instead, they were displayed at a booth operated by Rubel Company, a middle-level retailer. An arrangement between Casper and Rubel provided that Rubel would, under its own name, advertise, sell, and bill for Casper banks; Casper would mail the banks to purchasers using Rubel labels.

53. Sales representatives of John Wright attended the Atlantic City Glass & China Show in January 1973, where they first learned that John Wright had a major new competitor. They did not know where or under what auspices the competing banks were being manufactured; they only knew that Rubel was selling them.

54. During the latter half of 1973, Casper undertook, in addition to its Rubel outlet, a direct mail-order solicitation campaign for its penny banks using the name "Casper's Collector's Society." For this mailing Casper used lists of names rented from Mark Cross, Ambassador Leather Goods, and other retailers. The primary promotional tool for this campaign was a full-size color brochure designed by a "direct mail consultant" named Richard Buehrer, whom Casper also commissioned to design a "certificate of authenticity" for its banks.

55. Pinsker gave Buehrer background material to use in designing the Casper's Collectors' Society Brochure and certificate of authenticity. These included a copy of *Old Penny Banks* (a standard reference work on the subject) and a copy of the John Wright General Store Catalogue for 1973. Pages 22 through 25 of the catalogue featured photos and functional descriptions of John Wright's 31 penny banks from The Book of Knowledge collection. John Wright's Book of Knowledge certificate of authenticity appears on page 22 of the catalogue. Pinsker knew at the time that John Wright was the only manufacturer of penny banks using such a certificate of authenticity in connection with its products.

56. The certificate of authenticity designed for Casper by Richard Buehrer is reproduced on following page:

# Certified Affidavit of Authenticity

**T**he mechanical coin bank accompanied by this certificate is an exact and authentic duplicate reproduction of the original antique. Your mechanical coin bank will bear objective comparison with originals in museums and banks of record described in collector's references and in "Old Penny Banks," Library of Congress Catalog Card No. 60-13061.

It is further certified that the same techniques, processes and skills were used in making this fine replica. Molds were skillfuly made by professional craftsmen like the originals and then hand-cast, after which this bank was assembled and carefully decorated by hand. It was then tested and inspected to be certain it is in good working order and free of flaws and defects often found in cast metal.

It is, furthermore, more than a mere toy coin bank, it is a true replica of the skill and ingenuity of the late 19th Century and truly a treasured collector's item of considerable historical value and interest.

CASPER'S
COLLECTOR'S SOCIETY

It is an obvious and studied imitation of the John Wright certificate, which not only paraphrases the John Wright text (though it adds new material) but also copies from it such details as the scalloped border, brown ink, and title typeface. In a side-by-side comparison of the two certificates an average purchaser would certainly notice the differences between them, especially the fact that Casper's prominently displays the name "Casper's Collectors' Society" and does not mention "The Book of Knowledge." At a distance, however, the Casper certificate could well be mistaken for that

of John Wright. It is important to note, in this connection, that Casper banks and John Wright banks are rarely, if ever, carried by the same retailer or gift shop. Thus, prospective purchasers have no opportunity to make a side-by-side comparison of the two certificates of authenticity or other advertising literature and point-of-sale display materials distributed by the rival companies.

57. Although Casper's certificate is, on its face, entitled, "Certified Affidavit of Authenticity," it is consistently referred to in Casper's promotional literature as (like John Wright's) a "certificate of authenticity."

58. "Casper's Collectors' Society," which Casper advertises as the guarantor of the authenticity of its penny banks, is a fictitious name used by Casper. It is not a functioning collectors' organization and has no members, other than Casper Pinsker himself. Thus, contrary to the impression conveyed by Casper's advertising and certificate of authenticity, Casper penny banks are merely self-guaranteed, and are not certified authentic by an independent authority as John Wright's penny banks are.

59. Neither Casper's certificate of authenticity, nor any other current Casper advertising on record in this case, mentions that Casper's penny banks are manufactured outside the United States or, specifically, in Taiwan. An early version of the certificate contained the word, "Taiwan," in the lower right corner, but this was removed and has not reappeared. On the underside of the base of most Casper banks appears the logo, "CP/TAIWAN." There is no way for a prospective buyer to discover the country of manufacture other than by handling an actual Casper bank and turning it upside down to see this logo on the base. Obviously persons who order Casper banks from a catalogue or through mail-order solicitation have no opportunity, before purchase, to discover this.

60. In its advertising, Casper takes pains to suggest that its penny banks are American-made. Casper's 1973 brochure claims, to begin with, that Casper "has made *special arrangements* with metal foundries" to reproduce original penny banks (emphasis in original). Across the top of the inside page, above photos of the Casper banks, is a banner touting, "American Mechanical Penny Banks." And on the back page are sketches of "Actual Design Patents" and "Original U.S. Government Patents," plus copy which discusses the role of the Old Stevens Foundry in making original penny banks in the 19th century, complete with a drawing in the margin, entitled, "Old Stevens Foundry in Cromwell, Conn."[1]

61. The Casper color brochure contains copy describing the "action" of each Casper bank. With respect to the 13 Casper banks which are identical to models sold by John Wright, the Casper descriptive copy paraphrases John Wright's 1973 catalogue copy, pp. 22–25, to some degree. It also draws heavily on the text of *Old Penny Banks*, Buehrer's other source material. Considering that the copy in each instance was designed to explain the functioning of an identical item, the resemblance between the Casper and John Wright copy is not so striking as to warrant an inference of deliberate copying.

62. Casper has no affiliation with the Old Stevens Foundry in Cromwell, Connecticut.

63. The "Casper Collection" of penny banks, which is featured prominently in Casper's color brochure, is a collection of Casper reproductions, not original 19th century mechanical penny banks.

64. Casper holds no patents on any original mechanical penny banks, or on reproductions of originals.

65. Casper abandoned the direct-mail approach, under its own name, after its initial effort in the autumn of 1973. Instead it concentrated on working through

---

1. A photocopy of Casper's 1973 brochure is appended to this Memorandum and Order as APPENDIX A.

middle-level retail agents, to sell penny banks through mail-order gift houses, department stores, specialty shops, and indirect mail solicitations under the auspices of third parties such as Mastercharge, Bankamericard, and lending institutions. Until very recently all of Casper's contacts with the actual sellers was through the medium of retail agencies such as Rubel, Ted Arnold, and Cooper Rand. The solicitations sent to prospective purchasers deemphasized the name of the manufacturer (or failed to mention the manufacturer at all). They did, however, stress that the banks were "certified authentic" and were accompanied by a "certificate of authenticity."

66. Advertising for Casper banks has not changed in any material respect since its first color brochure and certificate of authenticity were printed in 1973.

67. Sixty percent (60%) of penny banks sold by Casper are by mail order, not over the counter.

68. Hammacher-Schlemmer, a mail-order gift house which advertises specialty gifts in newspapers and publishes numerous gift catalogues under its own name and others, ordered some penny banks from the plaintiff, John Wright, in October 1972. Several banks were delivered, together with promotional material, including at least a reference to (if not a copy of) John Wright's certificate of authenticity from The Book of Knowledge. There were delivery problems with the remainder of Hammacher-Schlemmer's order, as a result of which Hammacher-Schlemmer withdrew its offer to carry John Wright penny banks during the coming year. It was still interested in penny banks, however, and in late 1973, it contacted Casper—through Rubel—and arranged for Casper banks to be included in its gift inventory. Hammacher-Schlemmer ads for Casper penny banks appeared in the *New York Times* on December 9 and 15, 1973, and in the *Wall Street Journal* on December 17, 1973. The banks

also were advertised in the 1974 Gift Catalogues of Hammacher-Schlemmer and Lewis & Conger (an outlet owned by Hammacher-Schlemmer). In none of these advertisements was the name of the penny bank manufacturer stated, and in all of them appeared the erroneous claim that the banks shown (Casper's) were reproduced from the Book of Knowledge collection. The ads also stated that each bank "bears a certificate of authenticity."

69. These ads were prepared under the direction of Hammacher-Schlemmer's Director of Marketing, Anthony J. Crupi, who at that time had not seen the Casper certificate of authenticity or any promotional materials from Casper other than several banks [2] and a stock list. He used copy from an old Hammacher-Schlemmer catalogue (which advertised John Wright banks, again with no manufacturer's name given) to write copy for the Casper banks. He used the "Book of Knowledge" line, he says, because "it came with the copy from Wright, and it sounded as though it was important."

70. Casper did not participate in the preparation of copy for the Hammacher-Schlemmer advertisements. Orders for the banks shown in those ads were filled with Casper banks, without notice to purchasers of the "Book of Knowledge" error. No evidence appears in the record to suggest that there was customer dissatisfaction with the Hammacher-Schlemmer banks, such as returns from people who thought they were buying John Wright banks, not Casper's.

71. On November 13, 1974, nearly one year after the erroneous Hammacher-Schlemmer newspaper ads appeared, Casper Pinsker wrote to Crupi and pointed out the mistake. Pinsker claims to have advised Crupi of this verbally at the time the ads first appeared, and the letter of November 13, 1974, in as self-serving a manner as can be imagined, so states. Crupi has no recol-

---

**2.** Casper banks usually are accompanied, however, by a copy of the Casper certificate of authenticity; and, although Crupi does not remember having seen any reference to the cer-

tificate, it would have been likely, considering Casper's stress on this from the start, that the certificate was at least mentioned in the stock list brochure.

lection of having received such notice from Pinsker prior to the November 13, 1974 letter. Hammacher-Schlemmer deleted all reference to The Book of Knowledge in its Casper bank advertisements after receiving Pinsker's letter. The error has not been repeated.

72. Hammacher-Schlemmer's 1973 newspaper ads for Casper banks used drawings which were the same or similar to ones designed by Lee Howard for Grey Iron in the early 1960s. No one has been able to shed light on how Howard's drawings might have fallen into Hammacher-Schlemmer's hands, except that John Wright banks were sold by Hammacher-Schlemmer for several years prior to 1973, and promotional materials received in connection with them may have included the Howard line drawings. Since 1974, Hammacher-Schlemmer ads for (Casper) penny banks have featured line drawings by artists hired by Hammacher-Schlemmer.

73. The Lewis & Conger and Hammacher-Schlemmer catalogues which mistakenly linked Casper banks with The Book of Knowledge were in circulation through the autumn of 1974, and caused confusion among customers and retailers, sparking inquiries to John Wright as to whether its banks were the subject of the advertisements. The reaction among certain gift shop owners who carried John Wright banks was anger and the suspicion that their supplier was underselling elsewhere.

74. A second Casper-John Wright mix-up occurred in the fall of 1974 in connection with a penny bank ad run as a promotion for Chesterfield cigarettes. Mutual Marketing, a middleman in touch with Casper, brought some Casper banks to an advertising agency called Oberly & Newell, which was hired by Chesterfield to design a gift-promotion advertisement. Casper itself did not participate in the preparation of Oberly & Newell's copy for Chesterfield. Chesterfield had first solicited John Wright to furnish penny banks for the promotion, but John Wright declined because it could not guarantee production of the number of banks sought by Chesterfield.

75. A freelance copywriter wrote the Chesterfield copy for Oberly & Newell. It included the statement that "Each [bank] comes with an official certificate of authenticity from Book of Knowledge." This Chesterfield advertisement was used as an advertising supplement in many newspapers throughout the country and also was mailed directly to prospective purchasers. It remained in circulation through early 1975. The copywriter who prepared the penny bank ad had before him a number of penny banks from John Wright and from Casper, each with a "certificate of authenticity" wrapped around with a rubber band. He had no other promotional literature either from John Wright or from Casper.

76. When the erroneous Chesterfield ads appeared, Oberly & Newell was contacted by Mutual Marketing and told of the mistake. Mutual Marketing had received a letter from Casper Pinsker dated January 22, 1975, which pointed out the error and suggested that persons ordering the banks from Chesterfield be informed of the mix-up. Oberly & Newell's client, Chesterfield, was contacted independently by The Grolier Society, which lodged a protest against the use of its name in connection with Casper's products. After consultation among the various parties, Chesterfield decided to fill all its penny bank orders with John Wright banks, and did so.

77. The Chesterfield ads, like the Hammacher-Schlemmer/Lewis & Conger ads, prompted inquiries (ranging from curious to angry) to John Wright from individual customers and from retailers, asking whose banks were involved and why at such a low price.

78. The Grolier Society never authorized Casper to use its name or "The Book of Knowledge" in connection with its banks.

79. Retail prices for Casper penny banks are significantly lower than those charged for John Wright's. In several instances, including the Indian and Bear Bank and the Uncle Sam Bank, the retail price of the Casper model is less than the wholesale price of its John Wright counterpart.

80. Casper has expanded its penny bank line steadily since 1973. In 1974 it purchased the original Capron Collection and the master molds for Capron reproductions which were previously owned by Mechanical Replicas, Inc. (a Capron family business) and Art Concepts, Inc.

81. An in-court, side-by-side comparison of Casper penny banks and their John Wright counterparts proved that, in terms of overall quality and details of workmanship, Casper banks are inferior to John Wright's and, a fortiori, to the 19th century original banks of which Casper claims its banks are "authentic, certified replicas—accurate [and] perfect in every detail." The seam construction of Casper banks is poor, and their "hand-painted" decoration is slapdash and sloppy. Casper penny banks, in short, look like cheap imitations and cannot truthfully be advertised as "exact copies" of original 19th century penny banks.

82. If prospective purchasers had an opportunity to compare Casper and John Wright banks side-by-side they would, in the exercise of ordinary care, surely notice the obvious differences in quality between the two lines of banks. They have no such opportunity for comparison, however, because the parties sell banks through different retail outlets and Casper, in particular, sells most of its banks through mail-order solicitations.

83. Casper's entire business consists of manufacturing and selling mechanical penny banks.

84. Casper Pinsker, as an individual, does not advertise, sell, promote, manufacture, or import penny banks. His efforts on behalf of Casper Corporation have been solely as its agent.

85. After Casper Corporation entered the field in 1973, other companies began to sell foreign-made penny banks in the United States. Most advertise in "import" catalogues or signify in some other unequivocal fashion (such as a prominent notation on the product package) that their banks are of foreign manufacture.

86. John Wright banks are "authentic reproductions" in that they are cast from master molds which were in fact fashioned from disassembled, original antique penny banks. John Wright's manufacturing process follows in all material respects the hand-cast, sand mold process used to make the originals in the 19th century. Its modern deviations—the use of spray paint for base-coat decoration and the substitution of aluminum for brass masters—are minor and do not detract from the authenticity of the product.

86a. Casper claims to use a manufacturing process which is substantially similar to John Wright's, but it cannot prove this. Neither has John Wright disproved it. The obvious inferior quality of Casper penny banks, compared to the plaintiff's, casts doubt on Casper's assertion of authenticity but does not disprove it.

87. Between April 1, 1974, and April 1, 1975, sales fell on 10 of the 13 models of John Wright penny bank counterparts of which are in the Casper line and sold by Casper at lower prices. Before April 1, 1974, sales trends were up on all John Wright banks reproduced from the Book of Knowledge collection.

88. The New Hampton General Store, a retail client of John Wright which operates a mail-order gift catalogue business, changed its John Wright advertising copy in its Winter 1975 catalogue to add the phrase, "Finest American Quality," in response to customer inquiries about whether John Wright banks were made in the United States or Taiwan. These inquiries coincided with Casper's fullblown entry into the retail, gift, and mail-order field in mid-1974.

89. John Wright first learned the corporate identity of its competitor Casper in mid-1973, and did not begin to receive customer inquiries and complaints until mid-1974, after the erroneous Hammacher-Schlemmer, Lewis & Conger, and Chesterfield ads appeared. The instant Complaint was filed in January 1975.

90. Casper's use of a certificate of authenticity, which is confusingly similar to that pioneered by the plaintiff and its

predecessors and associated in the public mind with John Wright penny banks, has created and continues to create a likelihood of confusion among prospective purchasers, retailers, and advertisers, and in ·fact has caused actual confusion, with resulting damage to the business and good will of the plaintiff.

## II. CONCLUSIONS OF LAW

1. This Court has diversity jurisdiction over John Wright's claim of unfair competition. 28 U.S.C. § 1332.

2. Jurisdiction over the false advertising claim is founded on § 39 of the Lanham Act, 15 U.S.C. § 1121.

3. The defendant Casper Pinsker has committed no act of unfair competition or false advertising against the plaintiff, either as an individual or while doing business as Casper Imports.

4. It is not an act of unfair competition or false advertising for the defendant Casper Corporation (Casper) to sell mechanical penny banks which are identical in every respect to penny banks sold by John Wright, the designs for which are in the public domain. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

5. Casper's use of a "certified affidavit of authenticity" which is confusingly similar to the legally-protected "certificate of authenticity" used by John Wright is an act of unfair competition under Pennsylvania law and also constitutes false advertising ·in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

6. It is not an act of unfair competition for Casper to use a John Wright Trick Pony Bank as the master model for its own Trick Pony, but it is a violation of the Lanham Act for Casper to advertise its Trick Pony as an authentic reproduction of an original 19th century penny bank in the Casper Collection.

7. The erroneous insertions of "Book of Knowledge" copy in Hammacher-Schlemmer, Lewis & Conger, and Chesterfield ads for Casper banks are not chargeable to Casper as acts of unfair competition but are technical violations of the Lanham Act for which Casper is legally responsible. *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641 (3d Cir. 1958).

8. Casper is guilty of false advertising under the Lanham Act, but not unfair competition, in suggesting in its advertising that its penny bank reproductions are patented, that they are manufactured in the United States, and that they are exact copies of 19th century original penny banks.

9. It is not unfair competition or false advertising for Casper to use a catalogue format and descriptive copy which resembles those used by John Wright, since (a) none of these materials have attained a secondary meaning which identifies them with plaintiff, (b) Casper has not deliberately copied them from plaintiff, and (c) there is no showing that Casper's catalogue and copy are likely to cause confusion.

10. John Wright is not guilty of laches.

11. John Wright has made no material misrepresentations or committed any act of false advertising which would sustain Casper's proffered defense of unclean hands.

12. It is not unfair competition or a violation of the Lanham Act for John Wright to advertise its penny banks as reproductions from originals in The Book of Knowledge collection and to continue to distribute and promote its Book of Knowledge-endorsed certificate of authenticity, notwithstanding the facts that (a) Ellen V. McLoughlin is no longer Editor-in-Chief of the Book of Knowledge, (b) the Book of Knowledge Collection, as a single entity, no longer exists, and (c) the formal contract between The Grolier Society and John Wright's predecessor expired in 1970.

13. The plaintiff is entitled to injunctive relief and damages against Casper for Casper's numerous and deliberate acts of unfair competition and false advertising.

**314**

## III. DISCUSSION

In drawing the foregoing legal conclusions, I have looked, as I must, to the specific factual context of this lawsuit, *Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc.,* 281 F.2d 755 (2d Cir. 1960), and have not generalized from other cases or relied heavily on legal propositions which other courts have framed to meet inapposite fact patterns. It seems to me that John Wright's claims, and Casper's conduct, must be judged in the following context, particular to the parties and their line of business:

■ The plaintiff, John Wright, enjoyed for 17 years a position of unchallenged preeminence in the field of mechanical penny bank reproductions,[3] and made it the hallmark of its trade, from the beginning, that original antique banks were used as an integral part of its manufacturing process. Through its "certificate of authenticity" John Wright made it known that an independent, reputable authority, The Book of Knowledge, stood behind this claim. Plaintiff's avowal of "certified authenticity" set its penny banks apart from those offered by other manufacturers prior to Casper's entry into the field.

In 1973, Casper set out to mimic John Wright's claim of "certified authenticity," through its advertising generally and, more specifically, by using a "certified affidavit of authenticity" which it deliberately copied from John Wright's Book of Knowledge certificate. But Casper's attitude toward the meaning of "authenticity" was, and remains, very different from the plaintiff's. It is typified, I think, by the following comment, which is found in defendant's Reply Brief, at p. 4:

"[C]ommon sense tells us that to be an authentic replica of an antique, a copy need only look and operate like the antique; it would not be the expectation of consumers here, or in the case of such things as furniture or glass reproductions,

that the antique must be used as an integral part of the manufacturing process."

In a similar vein, Casper Pinsker testified on deposition that, to him, "authentic" meant "a replica as close to the original as we can make it." (Deposition of March 10, 1975, at p. 45).

It seems to me that the defendant has given away the game with these admissions. If this were a case involving reproductions of antique glass or furniture, I imagine that no manufacturer could truthfully or fairly claim that original pieces were used as integral parts of the reproduction process. In the field of penny banks, however, a quite different situation obtains. The senior competitor, John Wright, *has* used original antiques in the key stage of the manufacturing process and has truthfully advertised this fact, making it the hallmark of its trade, for many years. Under these circumstances, Casper's advertising, which suggests that its banks are "authentic" in the sense that John Wright has used that term, is likely to cause confusion. This is because retailers and private collectors of penny bank reproductions have come to expect, from their past exposure to John Wright advertising, that when a penny bank is advertised as an authentic, exact reproduction and accompanied by a "certificate of authenticity," it means that an original antique bank actually was used to make master matchplates, and not merely that the reproduction "resembles" the original. In other words, given the very different attitudes of the parties towards the meaning of "authenticity," their respective advertising and promotional claims should reflect that difference, lest customers be confused and lured into buying Casper penny banks under the mistaken impression that they are truly "authentic" in the John Wright sense.

■ Another important facet of the case involves timing. It would be a differ-

---

**3.** For purposes of this discussion, and equally applicable to all issues raised in this litigation, John Wright is entitled to the fruits of its predecessors' efforts, which began in 1957. *Home of the Week, Inc. v. Associated Press,*

*Inc.,* 178 F.Supp. 460, 464–65 (D.R.I.1959). It therefore will be treated as a competitor with 17 years' seniority, although it actually entered the field only six years before Casper.

ent case entirely if both parties had entered the field at or around the same time. John Wright, however, has 17 years' seniority over Casper, and has managed, through consistent advertising and promotion during this period, to drill into the consciousness of prospective purchasers and retailers its own notion of "authenticity." Under Pennsylvania law, as well as the general federal law of unfair competition, a junior competitor must adapt his sales and promotion techniques to the field as he finds it upon his entry, and has a duty to avoid or minimize the prospect of confusion among purchasers. *Goebel Brewing Co. v. Esslingers, Inc.,* 373 Pa. 334, 95 A.2d 523 (1953). As is obvious from the foregoing Conclusions of Law, I am convinced that Casper breached this duty in numerous ways. Its liability, both for unfair competition and false advertising (under the federal Lanham Act), is delineated in the discussion which follows.

## A. *Preliminary Issues*

Casper has not disputed this Court's diversity jurisdiction over plaintiff's unfair competition claim. There is plainly diversity of citizenship and a requisite amount in controversy. *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.,* 338 F.Supp. 762 (E.D.Mich.1972), *aff'd without opinion,* 473 F.2d 910 (6th Cir. 1973); *American Plan Corp. v. State Loan & Fin. Corp.,* 278 F.Supp. 846 (D.Del.1968) (pegging "amount in controversy" to plaintiff's advertising budget or sales volume for the allegedly infringed product). Likewise, there is Lanham Act jurisdiction by the terms of the statute itself, 15 U.S.C. § 1121.[4]

Several weeks after the hearing on plaintiff's motion for preliminary relief, defendants filed a motion pursuant to Federal Rule of Civil Procedure 15(b), seeking leave to amend their answer "to conform to the evidence introduced at the trial . . .". The motion proffers an affirmative defense of unclean hands and asserts a "first counterclaim" charging the plaintiff with acts of unfair competition and false advertising. I will grant the Rule 15(b) motion, and the answer will be deemed amended as set forth in the motion papers. For reasons which appear in later sections of this Discussion, however, I will dismiss the counterclaim and rule in plaintiff's favor on the issue of unclean hands. Likewise, I will reject the affirmative defense of laches which defendants raised in their original answer.

On the merits of the case, several issues can be resolved, at the outset, in favor of the defendants. First, the individual defendant Casper Pinsker and his corporate alter ego, Casper Imports, are entitled to judgment against the plaintiff on its claims of unfair competition and false advertising. No cause of action against either of these defendants has been proved. Pinsker, of course, is a controlling stockholder of Casper Corporation and has been active on its behalf in arranging and promoting the manufacture and sale of penny banks. He is, indeed, the central figure in Casper Corporation, but that does not render him personally liable for its actions. Likewise, the record will not support a finding that Casper Imports, Pinsker's wholly-owned corporation, is involved in the complained-of conduct. The only evidence which suggests a link between Casper Imports and Casper Corporation is Plaintiff's Exhibit 58, a letter from Hammacher-Schlemmer to plaintiff's counsel which refers to Casper Imports as its "supplier" of Casper penny banks. Casper Imports and

---

4. The law of Pennsylvania governs the unfair competition claim, *Pecheur Lozenge Co. v. National Candy Co.,* 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103 (1942), and is substantially in accord with federal law on the subject. *Goebel Brewing Co. v. Esslingers, Inc.,* 373 Pa. 334, 95 A.2d 523 (1953); *Surgical Supply Service, Inc. v. Adler,* 321 F.2d 536 (3d Cir. 1963). At the hearing on plaintiff's motion for preliminary relief, the parties stipulated, as to the Lanham Act claims, that decisions of the Second and Third Circuits would be primary authority (Tr. pp. 3–4).

Casper Corporation share an office address and, probably, some personnel (*e. g.,* William Mead.) But all of the evidence in the record, except for Plaintiff's Exhibit 58, is to the effect that Casper Imports, as an entity, is completely divorced from Casper Corporation and its penny banks. When it filed the Complaint in this action, John Wright obviously assumed that Casper Imports was the importing arm of Casper Corporation, but it has failed to prove this. Accordingly, the Complaint, as against Casper Pinsker and Casper Imports, will be dismissed, leaving Casper Corporation (Casper) the sole remaining target for plaintiff's claims of unfair competition and false advertising.

█ On the subject of appropriate relief, the key relief sought by John Wright— damages and an injunction prohibiting Casper from manufacturing and selling 13 mechanical penny bank models which are allegedly copied from corresponding models in John Wright's line—is precluded as a matter of law. Since John Wright's penny banks are neither patented nor copyrighted and their designs are entirely in the public domain, Casper has the perfect right, if it chooses, to copy these products. *Sears, Roebuck & Co. v. Stiffel,* 376 U.S. 225, 231–32, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). This would hold true even if, as plaintiff claims, the designs for its banks had become associated in the public's mind with John Wright[5] prior to Casper's entering the field in 1973. *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

█ Lastly, there has been a failure of proof on John Wright's claims that Casper (1) misappropriated scratchboard drawings which originated with plaintiff's predecessor Lee Howard; (2) used John Wright banks as samples in Casper display booths at trade shows; (3) used photographs of John Wright banks in Casper brochures; (4) copied John Wright's catalogue format and descriptive copy for use in Casper promotional materials; (5) used a John Wright Trick Pony bank as the master model for its own Trick Pony which Casper advertises as a replica of an original antique bank; and (6) wrongfully used John Wright's trade name, "Book of Knowledge" in Casper advertising. Of these claims, (1) through (4) fall for lack of proof either that such materials are entitled to legal protection (*i. e.,* are "distinctively" plaintiff's and recognized by the public as such, although not necessarily by name) or that Casper indeed misappropriated or copied them. Plaintiff's fifth contention does not state a claim for unfair competition since, under *Sears-Compco,* its Trick Pony bank may be freely copied and for Casper to advertise its copy falsely as a replica of an original bank amounts, at most, to "reverse palming off" which is not actionable in a suit for unfair competition. *Mastro Plastics Corp. v. Emenee Indus., Inc.,* 16 A.D.2d 420, 228 N.Y.S.2d 514, 517 (1st Dep't), *aff'd without opinion,* 12 N.Y.2d 826, 236 N.Y.S.2d 347, 187 N.E.2d 360 (1962). *Accord, Pic Design Corp. v. Sterling Precision Corp.,* 231 F.Supp. 106, 113–14 (S.D.N.Y.1964). As for claim (6), that Casper misappropriated the plaintiff's "Book of Knowledge" slogan, John Wright has established to my satisfaction that this slogan has acquired a secondary meaning and is entitled to protection against confusing imitation or appropriation. It has failed to prove, however, that Casper ever used the "Book of Knowledge" name, or any trade name or slogan confusingly similar to it, in connection with Casper penny banks. On several occasions, described in detail in Findings of Fact Nos. 68 through 78, copywriters employed by independent retailers mistakenly inserted The Book of Knowledge name into Casper advertising copy. This was done without Casper's knowledge, consent, or connivance, and can-

---

**5.** That is, they had attained "secondary meaning." This is a term of art in the law of unfair competition. For further discussion and analysis, see pp. 317–319 *infra.*

not be a basis for recovery under the law of unfair competition.[6]

The foregoing disposes of many of John Wright's claims. It leaves, under the rubric of unfair competition, only the allegation that Casper's certificate of authenticity is an unlawful misappropriation of John Wright's. And it eliminates some, but by no means all, of plaintiff's claims under the Lanham Act.

## B. *The Unfair Competition Claim*

■ The *Sears-Compco* rule does not preclude recovery for acts of unfair competition involving misappropriation or confusing imitation of trademarks, labels, or trade dress. *Sears, Roebuck & Co. v. Stiffel, supra*, 376 U.S. at 232, 84 S.Ct. 784. John Wright holds no trademark for its certificate of authenticity, but claims that it qualifies as "trade dress" and that Casper's use of a deliberately similar merchandising tool amounts to unfair competition.

■ I agree with this analysis. "Trade dress" is a concept which embraces the total image of a given product, including advertising materials and marketing techniques used to promote its sale. McCarthy, *Trademarks and Unfair Competition* § 8:1, at pp. 230–31 (1973). John Wright's certificate of authenticity is such an advertising tool. Therefore, if the plaintiff carries its burden of proving that its certificate is entitled to protection against imitation and that Casper's certificate is so

similar as to be likely to cause confusion in the field, Pennsylvania's law of unfair competition will afford relief. *Stroehmann Bros. v. Manbeck Baking Co.*, 331 Pa. 96, 200 A. 97 (1938).[7]

### 1. *The Meaning of Secondary Meaning*

"The traditional standard of recovery for . . . unfair competition requires proof of two elements: (1) that the public recognizes plaintiff's symbol as identifying his goods or services and distinguishes them from those of others, and (2) that defendant's actions cause a likelihood of confusion among the relevant buyer class. Element (1) could be shown in either of two ways: (a) that plaintiff's symbol was inherently distinctive [*i. e.*, a trademark in the classic sense], or (b) that even if not inherently distinctive, the symbol achieved customer recognition and 'secondary meaning.'" McCarthy, *supra*, § 15:4, at p. 524.

John Wright's certificate of authenticity, as noted above, is not the subject of a formal trademark, nor can it be considered "inherently distinctive." The plaintiff, then, is required to prove that the certificate is entitled to protection against confusing imitation on the basis of secondary meaning.

■ Secondary meaning is buyer association. The question is whether the relevant class of purchasers (which, in this case, includes both retailers and ultimate customers) associates the plaintiff's certificate of

---

**6.** A different result obtains under the Lanham Act for this and plaintiff's Trick Pony claim. See pp. 324–327 *infra*.

**7.** *Stroehmann* expressly recognizes a cause of action, under the Pennsylvania law of unfair competition, for protection against confusing simulation of distinctive advertising or merchandising techniques. *Sears-Compco, supra*, at 232, 84 S.Ct. at 789, left this area of state law intact. In its brief, Casper cites *Wembley, Inc. v. Diplomat Tie Co.*, 216 F.Supp. 565 (D.Md.1963), for the proposition that there can be no cause of action for unfair competition based on misappropriation of a merchandising

program. I read the case differently. The *Wembley* court denied relief on the merits and noted, correctly, that a merchandising plan *per se* "is not susceptible of protection," *id.* at 578. But the crux of the case was plaintiff's failure to prove that its merchandising plan had "secondary meaning" and that defendant's imitative plan was likely to confuse purchasers as to the origin of the parties' respective products. In *Wembley*, in other words, there was a failure of proof; the decision is not authority for the point Casper has tried to make; and Casper's position on this issue is clearly contrary to the law of Pennsylvania.

authenticity with the plaintiff's penny banks. *Quaker State Oil Refining Co. v. Steinberg*, 325 Pa. 273, 278–79, 189 A. 473 (1937). The purchasing public need not be aware of John Wright's corporate identity or recognize its penny banks *by name. Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133 (S.D.N.Y.1972).

■ Proof of this buyer association is a *sine qua non* of plaintiff's claim. The fact that two competitors use similar or even identical trade dress for their respective products, and that the purchasing public is likely to be confused as a result, does not establish that the plaintiff's trade dress has attained secondary meaning. *Miscellaneous, Inc. v. Klein's Fashions, Inc.*, 452 Pa. 62, 305 A.2d 22 (1973). In other words, if the buyer class is indifferent at the outset, and fails to associate plaintiff's trade dress with plaintiff's product, the law will not afford protection to that trade dress, no matter how closely or deliberately it is imitated by another.

■ Whether or not a particular advertising or merchandising technique has attained secondary meaning is a factual question and frequently a matter of inference. *Restatement of Torts* § 716, Comment *b*, at p. 650 (1938); *Premier-Pabst Corp. v. Elm City Brewing Co.*, 9 F.Supp. 754, 760 (D.Conn.1935). There is no particular length of time within which secondary meaning is established. The key is whether it has been attained, not in how long or short a time this was done. *Barton v. Rex-Oil Co.*, 2 F.2d 402, 405 (3d Cir. 1924). There is only one firm rule on timing; plaintiff's secondary meaning must have been attained before the junior competitor entered the market. *Quaker State Oil Refining Co. v. Steinberg, supra.* The rele-

vant period of time in the present case is 1957 through 1972.

■ In determining whether John Wright's certificate of authenticity has attained secondary meaning, it is appropriate to consider (1) the length and manner of its use, (2) the nature and extent of advertising and promotion,[8] and (3) other efforts made by the plaintiff in the direction of promoting a conscious connection, in the public's mind, between the certificate and plaintiff's penny banks. 3 Callman, *Unfair Competition, Trademarks and Monopolies* § 77.3, at p. 349 (3d ed. 1969). Of course,

> "the important evidentiary point to be kept in mind is that evidence of the seller's efforts to achieve buyer association and secondary meaning is merely circumstantial evidence from which the ultimate factual conclusion *may be* inferred. The crux of the matter is whether the seller's efforts have borne fruit in the minds of a substantial number of buyers—do they, in fact, associate [the certificate] with a single source?" McCarthy, *supra*, § 15:16, at p. 549 (emphasis in original).

■ Findings of Fact Nos. 18, 22, 23, 26, 28, 31, 33 and 39 through 42 marshal the evidence in support of my conclusion that John Wright's long, intensive, exclusive, and highly-publicized use and promotion of its Book of Knowledge-endorsed certificate of authenticity between the years 1957 and 1972 created a secondary meaning for that certificate, according to which a substantial proportion of the relevant buyer class came, in the course of those years, to associate the certificate with plaintiff's penny banks. This finding is not compromised by plaintiff's failure to present direct customer testimony on the issue of buyer association, for secondary meaning can be, and often is, inferred without any such direct proof.[9]

---

8. Proof that the certificate has been advertised for a number of years in connection with plaintiff's penny banks is relevant, but not, standing alone, enough to establish secondary meaning. *Quaker State Oil Refining Co. v. Steinberg, supra*, 325 Pa. at 280, 189 A. 473.

9. Although the record contains ample circumstantial evidence from which to infer that John Wright's certificate of authenticity attained a secondary meaning before Casper entered the field in 1973, it also contains some direct evidence on this issue. *See, e. g.,* plaintiff's Ex-

*See W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970); *Roux Laboratories, Inc. v. Clairol*, 427 F.2d 823, 831 (CCPA 1970) (a trademark case using a standard of "distinctiveness" analogous to "secondary meaning"); *Premier-Pabst Corp. v. Elm City Brewing Co.*, 9 F.Supp. 754, 760 (D.Conn.1935). *Cf. Zimmerman v. Holiday Inns of America, Inc.*, 438 Pa. 528, 536, 266 A.2d 87 (1970).

■ It should also be noted that secondary meaning, once achieved, is not vitiated by the fact that the plaintiff's formal affiliation with The Book of Knowledge ended in 1970. *Siegert v. Gandolfi*, 149 F. 100, 103 (2d Cir.), *cert. denied*, 205 U.S. 542, 27 S.Ct. 790, 51 L.Ed. 922 (1906). The point is that John Wright's certificate of authenticity has taken on an aura and customer recognition of its own, independent of its literal, descriptive contents. It has become "distinctively" John Wright's, as it is and without more.[10]

### 2. Likelihood of Confusion

Assuming, as I have concluded, that John Wright's certificate of authenticity has attained secondary meaning and is thus entitled to legal protection against unfair imitation, the question remains: Does Casper's certificate amount to unfair imitation? Is it, put another way, "confusingly similar" to the John Wright certificate?

■ The treatises and decisions on this subject recognize that "reliable evidence of actual instances of confusion is practically impossible to secure." *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 761–62 (2d Cir. 1960).[11] On the other hand "[t]he mere possibility that a customer may be misled is not enough. . . ." *Surgical Supply Service, Inc. v. Adler*, 321 F.2d 536, 539 (3d Cir. 1963). The golden mean between these two standards of proof is probability, or likelihood, of confusion. That is the test in an action for unfair competition.

■ The *Restatement of Torts* § 729, which the Pennsylvania Supreme Court adopted in *Goebel Brewing Co. v. Esslingers, Inc.*, 373 Pa. 334, 95 A.2d 523 (1953), lists several factors to be considered in determining whether the defendant's certificate is likely to cause confusion. These

hibit No. 23/162 (duplicate copies). This is a letter to John Wright from a gift shop owner in Florida, accusing plaintiff of underselling its penny banks in other outlets and thus cutting the throats of its gift shop clients. The letter encloses a copy of the erroneous Hammacher-Schlemmer catalogue ad which featured penny banks (Casper's, although not so named) with copy reading, "Reproduced from the Book of Knowledge Collection" and "accompanied by a certificate of authenticity." The letter states in part: "As you can plainly see, banks described *have to be John Wright* with the 'certificate of authenticity' in each package. . . ." (emphasis supplied).

I reject Casper's hearsay objection to this evidence and other letters from penny bank customers referred to in this Memorandum Opinion. *U. S. v. 88 Cases, More or Less, Containing Bireley's Orange Beverage*, 187 F.2d 967, 974 (3d Cir.), *cert. denied*, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951).

10. It is also clear, in any event, that notwithstanding the formal termination of contractual relations between Grolier and the plaintiff, Gro-

lier maintains a lively interest in John Wright penny banks and approves their continued association with The Book of Knowledge name and certificate of authenticity. Thus, Grolier itself lodged a protest with Chesterfield following distribution of Chesterfield's gift promotion brochure which featured Casper penny banks and erroneous copy linking them to The Book of Knowledge. Nor is it a misrepresentation of any sort for John Wright to continue to advertise its Book of Knowledge connection and to use the Book of Knowledge-endorsed certificate of authenticity. See the discussion of Casper's unclean hands defense and counterclaim, at pp. 327, 323–324, *infra*.

11. Of course, proof that confusion actually has occurred is highly persuasive on the question of whether confusion is likely to occur in the future, especially where the confusion is manifestly spontaneous. *Harold F. Ritchie, Inc., supra; Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975). The evidence of actual confusion in the instant case is summarized and evaluated at pp. 321–322 *infra*.

**320**

factors, which are not exclusive (Comment *a*, at p. 593), are:

a. The degree of similarity between the two certificates in terms of (i) appearance, (ii) pronunciation of words used, (iii) verbal translation of pictures or designs involved, and (iv) suggestion;

b. Casper's intent in adopting a certificate of authenticity;

c. The relation in use and manner of marketing between the John Wright certificate and the Casper certificate; and

d. The degree of care likely to be exercised by purchasers.

#### a. *Degree of similarity*

Comment *b* to § 729 cautions that similarity of appearance should be determined "on the basis of the total effect of the [defendant's certificate], rather than on a comparison of individual features." Using this standard of comparison, I find that the parties' respective certificates (reproduced in Findings of Fact Nos. 22 and 56, *supra*) are substantially similar in overall appearance (typeface and border design), in text, and especially in suggestion.

#### b. *Casper's intent to copy*

■■■ The evidence shows that Casper deliberately imitated John Wright's certificate of authenticity; that the artist hired by Casper worked from John Wright materials in designing Casper's certificate; and that Casper knew, at the time, that John Wright, and no other penny bank manufac-

turer, used such a certificate as an important selling tool for its penny banks. The conclusion is inescapable that Casper hoped by this maneuver to derive commercial benefit from the reputation for high quality penny bank reproductions which John Wright had developed through the use of its certificate over the years. Under such circumstances, Casper's intent "may be sufficient to justify the inference that there is confusing similarity" between the two certificates. *Restatement of Torts* § 729, Comment *f*, at pp. 594–95. I make that inference here. *Accord, Tisch Hotels, Inc. v. Americana Inn, Inc.* 350 F.2d 609, 613 (7th Cir. 1965); *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.,* 281 F.2d 755 (2d Cir. 1960); *Chesebrough Mfg. Co. v. Old Gold Chemical Co.,* 70 F.2d 383 (6th Cir.), *cert. denied,* 293 U.S. 599, 55 S.Ct. 116, 79 L.Ed. 691 (1934). *See also Goebel Brewing Co. v. Esslingers, Inc.,* 373 Pa. 334, 95 A.2d 523 (1953). Here, like the hypothetical infringer referred to in Comment *f*, Casper claims that its artist was directed to work from John Wright materials in order to avoid, not create, similarity. I reject that explanation and find, on the contrary, that Casper's manifest intent to imitate is evidence of likelihood of confusion between the two certificates.[12]

It bears emphasis, in this connection, that Casper refers to its certificate as a "Certificate of Authenticity" in all of its advertising, despite the fact that the document is titled, on its face, "Certified Affidavit of Authenticity." There is no reason for Casper to misstate the title of its "affidavit" other than to capitalize on the plaintiff's well-known "certificate." Such conduct enhances the likelihood of confusion between the two lines of banks and, in my judgment, was calculated to have this effect.[13]

---

**12.** "Since [the defendant] was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy is highly persuasive. His denial *that his conduct was likely to achieve the result* intended by him will ordinarily carry little

weight." *Restatement of Torts* § 729, Comment *f*, at p. 595.

**13.** For the sake of simplicity, however, and taking a cue from Casper, I will refer to both parties' versions as "certificates of authenticity" in the course of this discussion.

#### c. *Relation and manner of marketing*

Casper's merchandising program is for all practical purposes a mirror image of John Wright's, although it takes care to operate through different retail channels. Both parties sell penny banks to retailers through trade journals and catalogues. Both show their banks at trade shows, make banks available to third parties for mail order promotions, and sell penny banks to individual customers through gift shops and department stores. Considering the identical marketing methods used by the parties, the confusion likely to result from their use of substantially similar certificates of authenticity is further enhanced. *Field Enterprises Educational Corp. v. Cove Industries, Inc.,* 297 F.Supp. 989, 996 (E.D.N.Y.1969) ("Such criteria as . . . degree of competition, methods of distribution, [and] advertising . . ., as well as outward appearance, must be considered.").

#### d. *Degree of care exercised by purchasers*

█ The test is whether "an ordinary purchaser," using ordinary care and caution, is likely to be confused. *McLean v. Fleming,* 96 U.S. 245, 24 L.Ed. 828 (1877); *Heinz v. Lutz,* 146 Pa. 592, 23 A. 314 (1892). Thus, the fact that a "careful and discriminating purchaser" might be able to distinguish between the parties' certificates and products,

> ". . . is not the issue. It is the casual and ordinary, non-discerning buyer who is to be protected. To him the test is one of general overall impression gained at a glance." McCarthy, *Trademarks and Unfair Competition* § 8:4, at p. 238 (1973).

Sixty percent, or more, of Casper penny banks are sold through mail order, giving prospective purchasers no opportunity to make a careful choice or to compare the John Wright and Casper certificates and banks. As for over-the-counter sales, the parties rarely, if ever, sell through the same retailers. The Findings of Fact treat this issue in ample detail. Suffice it to say that an ordinary purchaser, in the exercise of ordinary care, is likely to be confused by the Casper certificate's similarity to John Wright's.

#### e. *Additional factors*

█ Another consideration of special relevance to this case is the near-identity of goods sold by the parties and promoted by each with a certificate of authenticity. Where the products are so alike, a lesser degree of similarity between their respective advertising is likely to cause confusion. *Bickmore Gall Cure Co. v. Karns,* 134 F. 833, 835 (3d Cir. 1905). Put another way, the burden on Casper, as junior competitor, is heavier under such circumstances to avert confusion and not create or exacerbate it.

Also to be considered is the crucial role which the plaintiff's certificate plays in promoting the sale, popularity, and reputation of its penny banks. Clearly, the certificate of authenticity is and consistently has been a focal point of John Wright's penny bank merchandising effort, as Casper, in effect, conceded when it chose to imitate it. Thus, this qualifies as a case where the infringed item is "an important stimulant to the sale of goods" with which it is associated, and a lesser degree of similarity between the two certificates is likely to cause confusion. *Restatement of Torts* § 729, Comment *g.*

Finally, there is some evidence in the record that the Casper certificate has in fact caused confusion. See Plaintiff's Exhibits Nos. 23/162, 24, 25, 159, and 160. These are spontaneous, unsolicited letters to John Wright from gift shop owners and other customers asking if (or assuming that) Casper banks, advertised as "certified, authentic" replicas with a certificate of authenticity (but with no manufacturer's name given), are John Wright banks. This is evidence from which, by clear inference,

likelihood of confusion may be proved. *World Carpets, Inc. v. Dick Littrell's New World Carpets, Inc.,* 438 F.2d 482, 489 (5th Cir. 1971).[14]

Further evidence of actual confusion concerns the advertisements for Casper banks which were published by Hammacher-Schlemmer, its outlet Lewis & Conger, and Chesterfield. The copywriters who mistakenly inserted "Book of Knowledge" copy into these Casper ads had before them identical banks, each of which had a "certificate of authenticity" wrapped around it with a rubber band. Even assuming, as Casper contends and as several of the copywriters testified, that the errors were made through carelessness and inadvertence, this evidence of multiple, independent confusion is too "coincidental" not to be related, albeit indirectly, to Casper's use of a certificate of authenticity which so closely resembles the plaintiff's.

■ This evidence of actual confusion is not strong or compelling, to be sure. Considered, however, in conjunction with the evidence of Casper's manifest intent to imitate, the substantial similarities between the two certificates, the near-identity of the goods involved, and the parallel marketing methods used by the parties, it supplies the crowning touch in support of my conclusion that Casper's certificate of authenticity creates a likelihood of confusion with John Wright's.[15] *Maternally Yours, Inc. v. Your Maternity Shop,* 234 F.2d 538, 543 (2d Cir. 1956). See also *Tefal, S.A. v. Products Internat'l Co.,* 529 F.2d 495, 497 (3d Cir. 1976).

### 3. Casper's Affirmative Defenses

#### a. Laches

■ The burden is on Casper to prove that John Wright delayed bringing this action; that such delay was "inexcusable"; and that Casper was prejudiced by reason of the delay. *Jenn-Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48 (3d Cir. 1972). Moreover, the mere fact that Casper spent money to promote its certificate of authenticity during the period of alleged delay does not establish the "prejudice" required by *Jenn-Air. Accord, Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir. 1965); *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,*

---

**14.** Several other letters, proffered by plaintiff as instances of confusion, are not helpful. Two (Exhibits Nos. 157 and 158) were prompted by ads for penny banks made by a manufacturer other than Casper. Two others (Nos. 156 and 161) may have been spurred by ads or displays for Casper banks but with no mention of its certificate of authenticity, and are therefore indicative of the general confusion to be anticipated whenever identical items are sold by difference companies, rather than referrable to confusion caused by Casper's use of a certificate.

**15.** Casper's fallback position on this issue is that many third parties, such as museums, mints, and other purveyors of collectors' items and reproductions from antiques, use certificates of authenticity to sell their wares. *See, e. g.,* Defendant's Exhibits Nos. 22 through 25, and 29. Several of these third-party certificates have a frilled or scalloped border like the John Wright and Casper certificates. Typefaces, texts, and overall formats vary.

The theory is dilution, *i. e.,* that third-party use of this merchandising technique dilutes John Wright's right to claim legal protection for its own certificate. The law on this point directs attention to whether the third-party use is in connection with competing goods. Proof that third parties use a similar sales technique for unrelated, noncompeting products is entitled to very little weight in determining whether there is a likelihood of confusion as between the plaintiff's and defendant's banks, which are in direction competition with each other. *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970); *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 612 (7th Cir. 1965). See also *Chips 'N Twigs, Inc. v. Chip-Chip Ltd.,* 414 F.Supp. 1003 at pp. 1017–1018 (E.D.Pa.1976). Casper has amply demonstrated that numerous purveyors of objets d'art and commemorative coins frequently use certificates of authenticity in selling such products. It concedes, however, that no manufacturer of mechanical penny bank reproductions, other than John Wright, used such a certificate prior to 1973. Since then, only John Wright and Casper have used certificates of authenticity. Under these circumstances, I will reject Casper's dilution argument, in reliance on the above-cited decisions.

350 F.Supp. 1341, 1364–68 (E.D.Pa.1972), affd. without opinion, 480 F.2d 917 (3d Cir. 1973); *Goebel Brew-Co., supra.* Where, as here, the defendant is a "non-innocent infringer," its burden is even heavier, for it must prove that the plaintiff's delay "is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time . . . ." *Tisch Hotels, supra*, at 615. The length of time necessary to establish inexcusable delay varies from case to case, depending upon the particular circumstances involved. *Wilson v. King of Prussia Enterprises, Inc.*, 422 Pa. 128, 221 A.2d 123 (1966).

██ There is no evidence in this case either of inexcusable delay, prejudice, or abandonment of the plaintiff's right to claim legal protection for its certificate of authenticity. As for delay: there was a lapse of 12 to 18 months, at most, between the time John Wright learned the corporate identity of Casper and the filing of the instant Complaint. During that time Casper pursued a merchandising plan of progressive encroachment in the market, increasingly direct competition, and—in mid-to-late 1974—"sudden promotional expansion aimed at exploitation of [the] market created by the plaintiff." *Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921, 927 (7th Cir.), *cert. denied*, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953); *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 355 F.Supp. 365, 370–71 (S.D.N.Y.), *affd.*, 470 F.2d 689 (2d Cir. 1972). Specifically: when Casper entered the field in January 1973, it did not advertise under its own name but rather sold banks anonymously through Rubel, a retail outlet. Later that year Casper undertook a one-shot direct mail promotion using the name, "Casper's Collectors Society." In

mid-1974, it expanded its merchandising significantly (still not under its own name), using "bang-tail remittance envelope" promotions sponsored by entities like Bankamericard, Mastercharge, and Military Book Club; and Casper banks were featured in gift catalogues published by Hammacher-Schlemmer (with the erroneous Book of Knowledge line included). Even if I were to assume, contrary to the testimony of John Wright personnel, that the plaintiff had full knowledge of Casper's conduct and knew Casper's identity as early as June 1973, I would hold that its delay in not bringing suit until January 1975 was not inexcusable. Clearly, when the damage to plaintiff's good will became manifest after publication of the Casper envelope ads and the Hammacher-Schlemmer and Chesterfield promotions, John Wright acted with dispatch and promptness to press its legal claims.

The total absence of evidence of prejudice makes it unnecessary, and impossible, to discuss that issue at all.

For these reasons I will reject Casper's defense of laches.[16]

b. *Unclean hands*

Casper alleges that John Wright itself is guilty of misconduct, in that (1) it continues to advertise that its penny banks are reproduced from The Book of Knowledge collection, which no longer exists as a single entity; (2) it exaggerates the actual number of its penny bank models which are Book of Knowledge reproductions; (3) it uses a certificate of authenticity signed by a person who is not now (and has not been for many years) associated with The Book of Knowledge; (4) it continues to advertise The Book of Knowledge affiliation despite the fact that its formal contractual rela-

---

**16.** Likewise, there is no meritorious defense of laches to plaintiff's Lanham Act claims, although in theory the defense is available, 15 U.S.C. §§ 1116, 1117 (directing that relief under the Act be granted—or denied—on equity principles). *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 15 (E.D.Pa. 1974).

**324**

tionship with Grolier expired in 1970; (5) its trade journal ads disparage Casper products, calling them cheap imitations of inferior quality; and (6) some John Wright retailers advertise incorrectly that John Wright penny banks are made from the "original molds" used to fashion the 19th century antiques. None of these allegations, even if true, would establish the defense of unclean hands.

 To sustain the defense of unclean hands Casper must establish misconduct on the part of the plaintiff which is "in reference to the very matter in controversy and not merely remotely or indirectly connected" with it. *Hartman v. Cohn*, 350 Pa. 41, 47, 38 A.2d 22, 25 (1944). The courts of Pennsylvania interpret this rule narrowly and are loathe to bar relief except where the plaintiff's conduct is clearly on point and "change[s] the equitable relationship of the parties." *Goebel Brewing Co. v. Esslingers, Inc.*, 373 Pa. 334, 349, 95 A.2d 523 (1953).

 Casper cannot meet this standard. First of all, it has failed to prove that John Wright in fact has committed any material misrepresentation, let alone a misrepresentation which is directly connected to its certificate of authenticity. It is not a misrepresentation for John Wright to continue to advertise its affiliation with The Book of Knowledge. See p. 319 n. 10, *supra.* The Book of Knowledge imprimatur is as valid today as it was in 1957; the fact that The Book of Knowledge Collection has been partially disbanded, that Ellen V. McLoughlin is no longer Editor-in-Chief, and that the Grolier-Howard contract expired in 1970, is irrelevant.

 I do not believe that John Wright has exaggerated its connection with The Book of Knowledge in terms of the number of banks involved, but even if it has, such a misrepresentation would not bar relief. *Goebel Brewing Co. v. Esslingers,*

*supra.* Assuming that John Wright's trade journal advertising disparages Casper's products, such conduct is not actionable in a suit for unfair competition, and would, *a fortiori*, not sustain a defense of unclean hands. Finally, the plaintiff is not responsible for advertising copy drafted by its independent retail clients (Casper receives an identical benefit with respect to the Hammacher-Schlemmer and Chesterfield ads) [17] and in any event, a misstatement about "original molds" does not meet the nexus test of *Hartman v. Cohn.*

**4. Summary**

 Although, owing to the near-identity of the goods sold by the parties to this lawsuit, some amount of confusion may be an unavoidable incident of lawful, healthy competition, Casper, as junior competitor, has a duty to avoid, and not to promote, confusion. *Goebel Brewing Co. v. Esslingers, Inc.*, 373 Pa. 334, 95 A.2d 523 (1953). It breached this duty by deliberately copying John Wright's certificate of authenticity which, because of its secondary meaning, is entitled to as much legal protection as a true trade "mark." Casper's imitative certificate is likely to cause confusion and has in fact done so. Casper, moreover, is a non-innocent infringer and has sought to exploit the natural potential for confusion which is implicit in the penny bank market. Its proffered defenses of laches and unclean hands are utterly without merit. I therefore hold that Casper's use of a certificate of authenticity is an act of unfair competition, and that John Wright is entitled to relief, both in damages and by way of an appropriately-framed injunction.

**C. The Lanham Act Claims**

 Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[18] is a remedial statute, designed to afford broad protection against various forms of unfair competition

17. See pp. 316–317, *supra.*

18. It reads, in pertinent part:
"Any person who shall affix, apply, annex, or use in connection with any goods or services,

. . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into

and false advertising. It prohibits, among other things, false representation in advertising. *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954). Where the false representation consists of misappropriation or imitation of plaintiff's merchandising technique or trade name, he must prove secondary meaning for the technique or name, without which there can be no likelihood of confusion or damage. *General Pool Corp. v. Hallmark Pool Corp.*, 259 F.Supp. 383 (N.D.Ill.1966). Thus, in this category of Lanham Act claims, federal law tracks classic principles of state law of unfair competition.

 The "false designation of origin" prohibited by § 43(a) refers not only to geographic origin but also to source of manufacture, *i. e.*, the identity of the manufacturer. *L'Aiglon Apparel, Inc. supra;* *Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405 (6th Cir. 1963). For purposes of injunctive relief, only a likelihood of confusion or a tendency to deceive need be shown. *Ames Publishing Co., supra.*[19] False representations need not be literally false; it is enough that they tend to convey a false impression. *Id.* The defendant's misrepresentations need not be willful or intentional, *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641 (3d Cir. 1958), although proof of deliberate dishonesty is relevant in determining likelihood of confusion and in framing relief.

 The statute also proscribes false representations about the quality of the defendant's own goods, "even where the misrepresentations do not tend to confuse [his] goods with those of a competitor or otherwise misstate the origin of the goods · . . ." *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.*, 397 F.Supp. 1063, 1072 (W.D. Pa.1975). It is, therefore, a violation of § 43(a) for a defendant to advertise, as an exact copy, an item which in fact is poorly made and deviates materially in quality from the purported original, *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261, 268 (S.D.N. Y.1968), even if the plaintiff is not the owner or manufacturer of that original. In such a case the plaintiff must show that he is likely to be damaged by this conduct.

 Section 43(a) also prohibits "reverse palming off," *i. e.*, conduct whereby the defendant purchases or otherwise obtains the plaintiff's goods, removes plaintiff's mark and replaces it with his own, and then proceeds to use the goods as models to solicit orders for its own goods. *Matsushita Elec. Corp. v. Solar Sound Systems, Inc.*, 381 F.Supp. 64, 69–70 (S.D.N.Y.1974). *A fortiori*, it would violate the statute for such a defendant to *sell* the remarked plaintiff's goods as his own. *See Pic Design Corp. v. Sterling Precision Corp.*, 231 F.Supp. 106, 113–14 (S.D.N.Y.1964) (dictum).

 There are limits to the reach of § 43(a). It does not, for example, prohibit misrepresentations about *another's* product. *Bernard Food Indus., Inc. v. Dietene Co.*, 415 F.2d 1279 (7th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92

commerce, . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

The cause of action belongs to members of the commercial class, *i. e.*, competitors. Mere consumers lack standing to sue under § 43(a). *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686 (2d Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). The competitor/plaintiff is a "vicarious avenger" of the public's right to be protected against false advertising. *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1 (E.D.Pa. 1974).

19. To recover damages under § 43(a), however, the plaintiff must prove that the defendant's false representation actually deceived "a portion of the buying public." *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958).

(1970). Nor is it a violation for a competitor to make a "Chinese copy" of plaintiff's goods and to advertise it, truthfully, as an exact copy, even if he names the plaintiff, without his consent, as the originator. *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33 (2d Cir. 1962). Finally, § 43(a) does not cover failures to disclose. Only affirmative, false representations are prohibited. *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232 (2d Cir. 1974).

John Wright seeks relief under § 43(a) for the following alleged violations by Casper: (1) the use of The Book of Knowledge name in Casper ads published by Hammacher-Schlemmer, Lewis & Conger, and Chesterfield; (2) Casper's use of a certificate of authenticity which (a) tends to confuse purchasers as to source of origin (*i. e.,* identity of manufacturer) of the banks; and (b) falsely suggests that Casper banks are "certified" as authentic by an independent authority on the subject; (3) the false impression in Casper ads that its penny banks are manufactured in the United States and are currently patented; (4) the false claim that Casper's Trick Pony bank is reproduced from an original in the Casper Collection; and (5) the false impression, fostered by Casper, that original antique banks are used to make master molds for all Casper reproductions. There has been a failure of proof on the last-listed claim, but on all of the others John Wright is entitled to relief.

### 1. *Misappropriation of the Book of Knowledge Name*

 The false claim of affiliation with The Book of Knowledge, which appeared in a series of ads for Casper penny banks, was a "false designation of origin" which caused a number of readers to assume that the banks advertised were plaintiff's. Casper did not write the copy for these advertisements, nor did it know of or authorize this misappropriation of plaintiff's trade name in advance of publication. But under § 43(a), a false designation of origin need not be willful or intentional, and even if the mistakes occurred through no "fault" of the defendant, they are technical violations of the statute for which Casper is legally responsible. *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641 (3d Cir. 1958).[20]

### 2. *Casper's Certificate of Authenticity*

 Casper's certificate of authenticity, which, as I have found, is confusingly similar to John Wright's, operates as a false designation of origin which tends to deceive purchasers into thinking that Casper banks are manufactured by the plaintiff. It follows that Casper's certificate violates § 43(a). *GRI Corp. v. Golden Fifty Pharmaceutical Co.*, 185 U.S.P.Q. 674, 677–79 (N.D.Ill.1975).

 There is also a § 43(a) violation in Casper's claim, through its certificate and its advertising generally, that Casper penny banks are "certified" authentic by Casper's Collectors Society. *See Natcontainer Corp. v. Continental Can Co.*, 362 F.Supp. 1094, 1100 (S.D.N.Y.1973). The "Society" is merely a fictitious name used by the defendant and not, as suggested by Casper, an independent, functioning guarantor of the authenticity and quality of Casper penny banks as, for example, The Book of Knowledge is vis-a-vis John Wright's penny banks. Customer complaint letters from Casper files bolster the plaintiff's contention that Casper's claim of "certified" authenticity is relied upon by purchasers and tends to deceive them into expecting a higher quality

---

**20.** These "no fault" violations would not, in my view, support an award of damages despite plaintiff's showing that at least some customers actually were deceived by the Casper ads. And where, as here, the violation has ended prior to judgment and is not expected to recur, even injunctive relief may properly be denied. *Parkway Baking Co., supra,* at 649.

product than Casper is able to deliver. See Plaintiff's Exhibits Nos. 79, 112, 115. This misrepresentation of the quality of Casper's own products is actionable under § 43(a). *Universal Athletic Sales Co., supra.* Moreover, Casper has violated the statute by claiming that its penny banks are "exact copies" of original banks, since, as I have found based on personal observation of Casper's banks, they deviate materially from the originals (and from the plaintiff's) in workmanship and quality. *Geisel v. Poynter Prods., Inc., supra.*

### 3. Country of Origin and U. S. Patents

Casper makes no representations concerning the geographic origin of its banks which are literally false, but the total impression conveyed by Casper ads—obviously by design—is that Casper penny banks are American-made. This is a material, false representation which is likely to deceive purchasers and has in fact done so. See Plaintiff's Exhibits Nos. 103, 109, 117 (complaint letters from Casper customers). Casper's misrepresentation of American manufacture is likely to damage John Wright in several ways. First, to the extent that other aspects of Casper advertising, especially its certificate of authenticity, cause customers to confuse Casper and John Wright, Casper's "American-made" claim tends to make such customers believe, or at least suspect,that John Wright is overcharging them and underselling to others. Second, people who, given an opportunity personally to inspect Casper banks with their "Taiwan" logo on the base, realize that Casper's banks are made in Taiwan, are likely to conclude that John Wright, by arrangement with Casper, has taken to selling cheap foreign imports of inferior quality. *See Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971).[21] Finally, even if prospective purchasers, unconfused by Casper's certificate of authenticity, regard the parties as entirely independent manufacturers, they are bound—if they believe Casper banks to be American-made—to regard John Wright as an unscrupulous overcharger. The country of origin of penny bank reproductions is also a matter of concern to John Wright customers and collectors of penny banks generally. See Plaintiff's Exhibits Nos. 74 and 156.

■ Plaintiff's Exhibit No. 55, Casper's 1973 advertising brochure, takes pains to suggest that Casper holds patents on original penny banks and/or Casper reproductions. Neither is true. A photocopy of the offending brochure is appended to this Memorandum and Order as Attachment A. This misrepresentation may be subtle, compared to some of Casper's other false claims of quality, but in my view it is nevertheless a material misrepresentation of quality which tends to deceive an ordinary purchaser in the exercise of ordinary care. It therefore violates § 43(a).

### 4, 5. Casper's Banks as Reproductions of Originals

■ The evidence in the record establishes to my satisfaction that Casper's Trick Pony penny bank is reproduced from a John Wright Trick Pony and not, as Casper claims, from an original antique bank in the Casper Collection. See Finding of Fact No. 48, and Hearing Transcript at pp. 77–78. Under *Sears-Compco* and *Societe Comptoir, supra,* Casper has a perfect right to copy John Wright penny banks, down to their last detail, and to advertise the reproductions, truthfully, for what they are—copies of plaintiff's goods. It may not, however, advertise such reproductions as replicas of

---

**21.** "Justifiably or not, a not insubstantial segment of the purchasing public believes that [goods] imported from [the Orient] are of inferior quality to American made goods. To the extent that such consumers are led to believe that [the plaintiff], whose products are all American-made, is importing items from the Orient, its goodwill and reputation suffer." *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd., supra,* at p. 1019.

**328**

its own original antiques. Such conduct amounts to "reverse palming off" in violation of the statute. *Matsushita Elec. Corp., supra; Pic Design Corp., supra.* Casper has committed such a violation with respect to the Trick Pony.

■ It cannot be said, however, that the other 12 Casper banks at issue in this litigation are not in fact reproduced from original 19th century banks. See Findings of Fact Nos. 47 through 50. Casper Pinsker is unable to confirm, on personal knowledge, that originals are used, but John Wright has the burden of proof and it has failed to establish, by a preponderance of the evidence, that originals are *not* used.

■ Finally, for the reasons already stated at length in a previous portion of this Memorandum decision, John Wright is not barred from relief under the Lanham Act either by laches or unclean hands. *Ames Publishing Co. v. Walker-Davis Publications, Inc.,* 372 F.Supp. 1 (E.D.Pa.1974); [22] *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,* 350 F.Supp. 1341, 1364–58 (E.D.Pa.1972); McCarthy, *supra,* § 31:7, at p. 388.

### D. *Casper's Counterclaim*

■ For the same reasons which compel rejection of Casper's defense of unclean hands, its counterclaim must be dismissed. Casper has not shown that John Wright's conduct infringes on a legally-protected interest of Casper's (*i. e.,* no showing of secondary meaning for any aspect of Casper's penny bank merchandising, including its

certificate), or that there is any likelihood of confusion attributable to John Wright's activities. Likewise, Casper has no claim under the Lanham Act, for John Wright has made no false representations and even if it had, Casper would not be likely to be damaged thereby. McCarthy, *supra,* § 31:16(b). At most, Casper can point to John Wright ads which disparages the quality of Casper penny banks. But commercial disparagement of a competitor's product is not actionable under § 43(a). *Bernard Food Indus., Inc. v. Dietene Co.,* 415 F.2d 1279 (7th Cir. 1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970); *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.,* 397 F.Supp. 1063 (W.D.Pa.1975).

### IV. CONCLUSION

John Wright is entitled to relief, under the Pennsylvania law of unfair competition and the federal Lanham Act, against Casper Corporation. A further hearing will be held on the issues of damages and attorney fees.[23] Meanwhile, I will issue an Order enjoining Casper from committing further acts of unfair competition and false advertising.

Any factual observations made in the course of the foregoing Discussion which are not expressly set forth as Findings of Fact in Part I of this Memorandum are hereby designated as such, pursuant to Federal Rule of Civil Procedure 52(a).

Appendix A to follow.

**22.** *Ames Publishing Co.* presents a strong policy argument in support of granting Lanham Act relief notwithstanding evidence of some misconduct by the plaintiff. Only a competitor has standing to bring an action under § 43(a); mere consumers do not. *Colligan v. Activities Club of New York, supra.* Thus, the plaintiff is a "vicarious avenger" of consumer rights. This weighs heavily in favor of granting relief, lest the court "leave two wrongs unremedied and thereby increase the injury to the public." 372 F.Supp. at 15.

**23.** The Lanham Act, as amended, provides that the court "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117 (Supp.1976). The same section authorizes the court, "subject to the principles of equity," to allow recovery of profits, costs, and damages "('for any sum above the amount found as actual damages, not exceeding three times such amount')." The parties are directed to file statements of their respective positions on these issues, including memoranda of law, in advance of the hearing.

APPENDIX A

Casper's Collectors Society Brochure
1973

**1850 AN EXCITING American Mechanical PENNY**

**No. 108 ARTILLERY BANK** — Load cannon with coin and draw back the hammer. Cannon all over... area is signal to "fire." Then lever. Cannon blasts coin into the bank when trigger... Original was produced in 1877. $15.00

**No. 122 JONAH & THE WHALE** — 1890. A huge whale opens ready to swallow Jonah who is being forced at him by the boatman but is saved the coin placed with Jonah is thrown into whale's mouth which opens to receive it when lever is pressed. $25.00

**No. 103 TEDDY ROOSEVELT & THE BEAR** — 1907. Our illustrious president wearing a derby. Load the gun with a coin, press the lever and Teddy Roosevelt leans his head, takes aim and fires the coin into the tree trunk and up pops an angry grizzly bear. $25.00

**No. 114 NOVELTY BANK** — 1872. One of the earliest banks in the form of a house with a dormer windows and 2 high chimneys. Upon opening the front door, teller advances to receive your coin which he deposits in the bank when the door is shut. $20.00

**No. 107 INDIAN & BEAR** — 1888. An Indian with a bit dress-knee and takes aim with gun to shoot coin into chest of large cub bear. To operate, draw back hammer, place the coin, press lever and coin is shot. Bear enjoys at hunter when hit. $25.00

**No. 118 THE DENTIST** — 1880. A comical, colorful tooth pulling scene... the coin, the dentist's fee, is placed in his pocket. When the tooth is pulled, both go sprawling and the coin drops from dentist's pocket into gas bag receptacle on base. $25.00

**No. 113 MASON & HOD CARRIER** — 1887. The hod carrier delivers the brick. Insert the coin and press it forward, depositing it in the bank while the mason lays bricks, trowel and places the mortar which he holds in a trowel-like fashion. $30.00

**No. 116 HUMPTY DUMPTY** — 1882. There's a colorful clown with a huge appetite for money. Put a coin in his hand and watch him. Pop it into his mouth, stick out his tongue and roll his eyes around in satisfaction as he swallows the coin. $20.00

**No. 100 STUMP SPEAKER** — This nattily dressed candidate doesn't mind accepting contributions. Put a coin in his hand, press lever and satchel opens to receive the coin and snaps shut while his jaw moves constantly in approbation. $25.00

**No. 105 PUNCH & JUDY** — 1884. A typical theatre with scenery, curtains and all. Place a coin in Judy's plate and press the lever. Punch rushes at Judy brandishing a club. Whack! Too bad Judy quickly turns and puts the coin in the bank. $25.00

COLLECTION of Nostalgic BANKS Available for COLLECTORS 1907

**No. 104 THICK PONY** — 1895. You simply place the coin in the pony's mouth. Now pull the lever in the back of the base and watch the pony arch his neck and nod his head while he drops the coin into the manger. A truly valuable blessed, of a pony. $25.00

**No. 117 THICK DOG** — 1888 — Clever, colorful and very popular in grandfather's day. You place a coin in the dog's mouth. When you release the spring, the dog, in one bound, trips through the loop held by a clown to deposit coin in the barrel. $25.00

**No. 101 UNCLE SAM BANK** — 1886. A popular favorite. Uncle Sam is treasured since. Put a coin in his hand and press the lever. Carpetbag opens, receives coin and snaps shut while Uncle Sam's whiskers move as he nods his thanks. $96.00

**No. 109 MULE ENTERING BARN** — 1880. Place a coin between the mule's hind legs. When the lever is pushed he will kick the money over his head and into the hay loft. A small dog, startled by the commotion, runs out of the barn. $15.00

**No. 118 INDIAN & POLICE** — 1890. An Indian sits in front of the temple holding a fish, this plunger enters the road. To disappear as a hidden trap traps out of the pond for the fish. The Indian quickly pulls the fish out of the way so the frog jumps for it. $25.00

**No. 102 ALWAYS DID 'SPISE A MULE** — 1879. A coin is placed beneath the stable boy as trap before a mule. Release the spring and mule suddenly spins completely around to kick the poor lad over the boy's bit ... Go a fall into the bank below. $25.00

**No. 117 SMILIN' SAM** — 1882. One of the early penny banks — you just place a coin in Sam's outstretched hand. Press the lever and his hand tips the coin into his mouth while he moves, his tongue and rolls his eyes. $20.00

**No. 118 MONKEY BANK** — (date unknown) Fascinating action of the monkey — a lever the monkey leans up with a coin in his mouth, to deposit it in the Organ Grinder's Music Box, then he's put back to beg for another coin. Colorfully decorated. $20.00

**No. 120 MAGICIAN BANK** — 1882 — A magician stands before a table on stage to make a coin disappear before your eyes. By pressing a lever to lower on his top hat over the coin, pick his head and Presto!, the coin has mysteriously disappeared! $35.00

**No. 121 PADDY & HIS PIG** — 1878. While Paddy is holding a coin, place a coin between his legs. A coin is placed on the pig's snout. When you press a lever Paddy opens his mouth and the pig kicks the coin at Paddy into his mouth. Apparent satisfaction. $25.00

Mail Enclosed Order Form For Your Own Bank

Illustration shows small portion of Casper's $10,000 Collection

ORDER

AND NOW, this 25th day of June, 1976, it is ORDERED that:

1. Judgment is entered in favor of the defendants, Casper Pinsker and Casper Imports, and against the plaintiff, John Wright, Inc.

2. Judgment is entered in favor of the plaintiff, John Wright, Inc. and against the defendant, Casper Corporation, on plain-

tiff's claims of unfair competition and false advertising.

3. Judgment is entered in favor of the plaintiff, John Wright, Inc., and against the defendant, Casper Corporation, on the defendant's counterclaim alleging unfair competition and false advertising.

4. A hearing will be held at 10 a.m., on September 10, 1976, Courtroom 15A, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, on the issues of damages, costs, profits, and attorney's fees. The parties are directed to file statements and memoranda of law on these issues no less than five (5) days before the hearing date.

5. The defendant, Casper Corporation, its officers, employees, and all persons acting in concert with it, are hereby enjoined from committing any of the following acts of unfair competition and/or false advertising:

a. Using, advertising, promoting, or distributing a "certificate of authenticity," a "certified affidavit of authenticity," or any similar document purporting to guarantee or "certify" the authenticity of Casper penny banks;

b. Claiming, in its advertising or otherwise, that its penny banks are "certified" as authentic, whether by Casper's Collectors Society, or any other entity controlled by Casper Corporation, or any other entity which is not an independent, functioning guarantor of the quality of defendant's banks;

c. Advertising, claiming, or referring to its Trick Pony bank as a reproduction of an original penny bank in the Casper Collection;

d. Advertising, claiming, or referring to Casper penny banks generally as "exact" or "perfect" copies, replicas, or reproductions of original antique penny banks;

e. Referring, in its advertisements, brochures, catalogues, and other promotional material, to the Old Stevens Foundry in Cromwell, Connecticut;

f. Referring, in its advertisements, brochures, catalogues, and other promotional material, to "Actual Design Patents" or "U. S. Government Patents;"

g. Suggesting, in its advertisements, brochures, catalogues, and other promotional materials, by any reference to American Foundries or patents, or otherwise, that Casper penny banks are manufactured in the United States and/or are patented.

6. To repair the damage and allay the confusion which its unlawful conduct has caused, the defendant Casper Corporation is hereby ORDERED to:

a. Insert in all Casper advertisements, brochures, catalogues, and other promotional materials which feature its Trick Pony bank, a disclaimer to the effect that such model bank is not in fact reproduced from an original antique penny bank but is, rather, a copy of another manufacturer's reproduction of an original bank;

b. Insert in all Casper advertisements, brochures, catalogues, and other promotional materials, information sufficient to advise the ordinary purchaser that Casper penny banks are imported merchandise;

c. Advise all mail-order houses, retail outlets, and other agents through which Casper penny banks are sold: (1) that Casper neither has nor ever had any connection whatsoever with The Book of Knowledge, The Grolier Society, or the plaintiff, John Wright; (2) that Casper penny banks are imported; (3) that "Casper's Collectors Society," which previously was advertised as the guarantor and certifier of the authenticity of Casper banks, is controlled by Casper; and (4) that Casper penny banks will no longer be "certified" authentic or promoted by use of a "certificate of authenticity," "certified affidavit of authenticity," or similar document.